ATTORNEY FOR APPELLANT
Robert M. Baker III
Indianapolis, IN

ATTORNEYS FOR INTERVENOR
Jon B. Laramore
Indianapolis, IN

Edward A. Sullivan III
Amy M. Steketee
South Bend, IN



FILED

Dec 17 2010, 2:24 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 71S03-1002-CV-119

INDIANA HIGH SCHOOL ATHLETIC
ASSOCIATION, INC,

*Appellant (Defendant below),*

v.

JASMINE S. WATSON, *individually, and by
and through her mother*, VALERIE K.
WATSON,

*Appellee (Plaintiff below),*

and

SOUTH BEND COMMUNITY SCHOOL
CORPORATION,

*Appellee (Intervenor below).*

Appeal from the St. Joseph Circuit Court, No. 71C01-0811-PL-245
The Honorable David Matsey, Special Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 71A03-0901-CV-25

**December 17, 2010**

**Shepard, Chief Justice.**

Jasmine Watson transferred from Elkhart Memorial High School to South Bend Washington High School and sought an athletic transfer allowing her to participate on the

basketball and track teams. The Indiana High School Athletic Association ("IHSAA") ruled her ineligible after determining she transferred for primarily athletic reasons.

Jasmine's mother sued on Jasmine's behalf and sought a preliminary injunction preventing the IHSAA from enforcing its ruling. The trial court held the IHSAA's decision was arbitrary and capricious, and it granted the injunction. We conclude the trial court improperly reweighed the evidence, and we therefore reverse.

## Facts and Procedural History

The details surrounding this dispute are so central to its disposition that we lay them out at more than the usual length.[1]

Jasmine Watson is an elite athlete who participated on high school basketball and track teams at the varsity level beginning her freshman year. (App. at 97.) She was a junior Indiana All-Star, had interest from prominent NCAA Division I basketball programs, unanimously won all-conference honors her sophomore and junior years, and was on pace to become Elkhart Memorial High School's career shot-block record-holder. (App. at 35, 97, 463, 476.) Jasmine attended Elkhart schools in elementary, middle, and high school until her senior year.

During the summer after her junior year, she played on two AAU teams with other elite players from around the state. (App. at 474–75.) The first team, called "The Family," practiced in Indianapolis, where its coach Kevin Merriweather also coached high school basketball. (App. at 9.) Merriweather's cousin Maurice "Mo" Scott ran the second AAU team Jasmine played for, called "The Soldiers," located in South Bend. (App. at 474–75.) He also ran the Martin Luther King, Jr. Center in South Bend, where Jasmine worked out. (App. at 474–75.) He also served as head coach of the South Bend Washington High School girls junior varsity basketball team. (App. at 477.) In June 2008, Washington named Scott head varsity coach. (App. at 474.)

---

[1] We describe them both favorably to the original finders of fact and on some points as found by the trial court.

As early as the end of the 2007–2008 basketball season (Jasmine's junior year), Jasmine and her family displayed displeasure with the Elkhart Memorial basketball program.[2]

Toward the close of the season in 2008, Jasmine's grandmother visited South Bend Clay High School and spoke with the head basketball coach about Clay's basketball program. (App. at 92.) She explained to Clay's coach Steve Scott that "they" were looking for a school for Jasmine to play basketball "because Elkhart Memorial was not getting Jasmine the ball enough and because they weren't treating her right." (App. at 92.) Jasmine had told her teammates around this same time that she was going to use her grandmother's address in South Bend to play at South Bend Washington. (App. at 92.) She said she wanted to transfer to Washington in order to win a state championship ring. (App. at 93.)

About the same time, Jasmine's mother Valerie Watson became angry with Memorial because it would not help pay for an advertisement about Jasmine in the 2008 Indiana All-Star magazine. (App. at 92–93.) She told several people she planned to take Jasmine to South Bend Washington to play basketball. (App. at 92–93.) Eventually, Memorial did help pay for the ad.

As the Watsons were communicating their frustration with Memorial, Washington representatives tried to convince Jasmine to transfer. Scott regularly took Jasmine aside to talk about transferring saying "it was best for her" and "she would have a better chance of being recruited by the elite colleges if she attended and played for South Bend Washington." (App. at 93.)

At the end of her junior track season, Jasmine's mother told Memorial track coach Tami Gregory that Washington "was pressuring Jasmine to come to that high school to play basketball." (App. at 94.) On May 25, 2008, Washington assistant coach Jose Robles informed several area coaches that Jasmine and two or three players from Michigan City would soon transfer for the coming academic year. (App. at 93.) These players all played on the Soldiers AAU team. (App. at 93.)

---

[2] There appears to be little basis for differentiating among family members: they either all wanted to move to a different team or none of them did.

On May 27, 2008, Jasmine let her Memorial basketball coach Larry Fielstra know that Scott frequently showed her his state championship ring and told her she needed to come to Washington in order to win one for herself. (App. at 93–94.)

In response to all this, Fielstra visited the Watsons at their home on July 18, 2008 to discuss the rumors about Jasmine transferring to Washington. (App. at 94.) At the meeting, Jasmine again acknowledged that Scott and a Washington fan had been recruiting her. (App. at 94.) She also stated that Ken "Tennessee" Hunt, a coach at the Tolson Center in Elkhart, told her that she should go to South Bend Washington. (App. at 94.)

Jasmine's mother admitted to Fielstra that she had talked to Washington's coaches about having Jasmine's statistics from Memorial transferred to Washington. (App. at 102.) She learned that these would not transfer. (App. at 102.) She further told him that the Memorial coaches' failure to push Jasmine as much as her AAU coaches also affected Jasmine's departure from the school. (App. at 94–95.) Finally, she said that their home was being foreclosed and that she had until November to remain in her home without paying. (App. at 95.) She was, however, already looking for houses. (App. at 95.)

Upon learning that the Watsons would soon lose their home, Fielstra began an effort to keep the family in Elkhart. On July 24, 2008, he talked to Hunt, who subsequently told Jasmine that she would be fine playing at either Washington or Memorial. (App. at 95.) Hunt also told Fielstra that Jasmine's mother had stated she would need help finding a new home and that Jasmine would need to "get the ball more" in order for the family to stay in Elkhart. (App. at 95.)

After talking to Hunt, Fielstra called Valerie and offered his help in finding housing. (App. at 95.) He then contacted several people who all indicated that they or their contacts had rentals in Elkhart available for the Watsons. He gave Valerie their contact information and the addresses of some of the rentals. One of them, Tonda Hines, contacted Valerie, but Valerie never followed up with Hines or any of the other names Fielstra gave her. (App. at 95, 103.)

4

During this time, Jasmine continued to play AAU basketball, including with the Family in Indianapolis, which participated in the Nike nationals in South Carolina. (App. at 474.) She returned home in early August. (App. at 10.) On August 4, Jasmine told Memorial assistant coach Kellie Price that she did not know if she would transfer to Washington but that her mother had rented a home in South Bend. (App. at 96.) Price offered to allow Jasmine to stay with her in order to remain in Elkhart. (App. at 96.) Jasmine replied that it was "too bad the offer had not been made before" and that if she could not get full eligibility at Washington, she would definitely stay at Memorial. (App. at 96, 103–04.) That same day, as part of Fielstra's continued efforts to prevent Jasmine's transfer, he learned that a Butler University coach had known about her move "for some time" before the two coaches' conversation. (App. at 96.)

After the Watsons moved to South Bend, Jasmine applied for an athletic transfer to Washington High School under IHSAA Rule 19-5, which provides for transfers due to changes in residence. (App. at 5, 11.) Washington's athletic director Marilyn Coddens filled out the transfer report. In explanation of their move, the transfer report stated that Jasmine's family had a decrease in income, their home was in foreclosure, and the family needed support from its extended family located in South Bend. (App. at 91.)

Indeed, the family had suffered substantial financial hardship. Jasmine's father had been incarcerated since 2005, so Valerie provided the sole income source for the family. Her employer of twenty years, Irvine Shade, located on the extreme east side of Elkhart, reduced her hours in the face of the recession. (App. at 97.) Her income decreased from approximately $40,000 in 2006 to about $28,000 in 2008. (App. at 97.) She enrolled for food stamps and unemployment compensation. (App. at 7, 97.)

Due to these financial difficulties, Valerie stopped paying her mortgage payments in December 2007. The mortgage company filed its foreclosure suit on June 2, 2008, and Valerie put her home on sale July 3, 2008. (App. at 98.) Additionally, Valerie has a judgment against her for a Visa credit card. (App. at 8, 97.) This judgment has resulted in her wages being garnished beginning March 2008. (App. at 97.)

5

The move from Memorial to Washington meant Jasmine would now play with a more competitive team during the school year. Although Memorial went 22–5 Jasmine's junior year and won sectional titles five years in a row, including all three years she played there, Washington consistently advanced further in the playoffs. (App. at 463.) During Jasmine's three years at Memorial, she watched Washington win a 4A state title and two runner-up finishes. (App. at 463–64.) In Jasmine's junior year, Washington defeated Memorial 73–56 in the regional final. (App. at 463.) During these years, Washington was led by Scott's step-daughter Skylar Diggins, a nationally known star. (App. at 477.) In fact, many regarded Diggins as the top high school guard in the country, and she played on the twelve-member USA eighteen-and-under team, which competed in Argentina in 2008. (App. at 477.)

Memorial, as the school which Jasmine left, had to sign off for Jasmine to have athletic eligibility at Washington. (App. at 5.) Memorial refused to approve the transfer, contending the move was for primarily athletic reasons in violation of IHSAA Rule 19-4 and the result of Scott's undue influence in violation of Rule 20-1. (App. at 5, 12.)

Rule 19-4, Transfers for Primarily Athletic Reasons, states:

> To preserve the integrity of interschool athletics and to prevent or minimize recruiting, proselytizing and school 'jumping' for athletic reasons, regardless of the circumstances, student athletes who transfer from one school to a new school for primarily athletic reasons or as a result of undue influence will become ineligible to participate in interschool athletics in the new school for a period not to exceed 365 days from the date the student enrolls at the new school, provided, however, if a student transfers and it is not discovered at that time that the transfer was primarily for athletic reasons, then under those circumstances, the student may be declared ineligible for a period not to exceed 365 days following the date of enrollment or, may be declared ineligible for a period not to exceed 365 days commencing on the date that the Commissioner or her designee declares the student ineligible which was the result of a transfer for primarily athletic reasons.

Rule 20-1, Undue Influence, provides:

6

The use of undue influence by any person or persons to secure or to retain a student, or to secure or to retain one or both of the parents or guardians of a student as residents, may cause the student to be ineligible for high school athletics for a period not to exceed 365 days and may jeopardize the standing of the high school in the Association.

NOTE 1: Submission of false information and/or withholding information may result in either suspension from membership in the Association or probation for the school for a period not to exceed 365 days.

NOTE 2: This rule shall include any undue influence that may be exerted by anyone on a student who has not yet entered the ninth grade, to enroll in a school other than their home school.

(App. at 90.)

Jasmine appealed to the IHSAA, which assigned Assistant Commissioner Bobby Cox to conduct an investigation. On August 8, 2008, Cox ruled Jasmine ineligible. Jasmine appealed this decision, and the IHSAA Review Committee held a hearing on October 9, 2008 to review Cox's ruling. The Watsons presented eight witnesses, and the IHSAA presented seven.

The Review Committee upheld Cox's decision, finding undue influence in violation of Rule 20-1 and a transfer for primarily athletic reasons in violation of Rule 19-4. (App. at 104–05.) In support of its conclusion that Scott had unduly influenced Jasmine, the Review Committee's final decision stated he encouraged her to leave Memorial for Washington (though of course, despite Scott, Valerie, Jasmine, and Washington assistant Don Coddens denied that Scott ever recruited Jasmine or any other player). (App. at 104–05.) Instead, the Committee gave credence to Memorial coach Fiesltra's descriptions of conversations he had with other coaches and his own players. (App. at 92–95.) It similarly cited testimony at the October 9 hearing by players who described instances of Scott's recruiting Jasmine. (App. at 93, 102.)

As for its conclusion that Jasmine had transferred for primarily athletic reasons, the Committee cited evidence that the family's economic hardship did not necessitate Valerie's decision to move to South Bend and enroll Jasmine at Washington High School. Instead, it concluded that these decisions "were done in order for Jasmine to play basketball at South Bend

Washington, and were for primarily athletic reasons." (App. at 105.) The Committee noted that it considered the motives both for moving from the Elkhart home and for moving to the home in the Washington school district. (App. at 105.) If either decision was athletically motivated, the Committee would determine that Jasmine sought the transfer for athletic reasons. (App. at 105.) If the Committee concluded that the athletic reasons were the primary reasons for the transfer, Jasmine would lose all athletic eligibility at Washington. (App. at 105.)

The Committee explicitly did not suggest Valerie crafted her financial difficulties or orchestrated the foreclosure, but it did "carefully scrutinize the choices a parent makes in dealing with such an event." (App. at 106.) It questioned the timing of Valerie's decision to take on the unnecessary burden of paying rent for the four months she could have stayed in her foreclosed home without payments. (App. at 106.) The Committee did not accept Valerie's explanation that she did not want her children to change schools after the academic year began because staying in the home would give her four additional months to remain in Elkhart to find a new home there and avoid changing schools at all. (App. at 106.) Instead of the family's stated reasons, the Committee concluded that the Watsons timed their move to allow Jasmine to begin training and practicing with her new team. (App. at 106.)

In questioning the move itself, the Review Committee noted that Valerie's commute to Irvine Shade would increase from seven miles from their Elkhart home to twenty-nine miles from their South Bend home. (App. at 99.) Valerie had contended that she moved to South Bend so that her extended family, which all lived in South Bend, could help with her children's transportation needs. (App. at 107.) The Committee emphasized that she could have moved to South Bend without moving to the part of the city most distant from Valerie's employer. (App. at 99, 106–07.)

The Committee also questioned Valerie's inability to find a satisfactory home in Elkhart, including her failure to accept Fielstra's help. (App. at 99, 108.) Valerie stated that she did not find any home in Elkhart that met her needs, namely a four-bedroom home she could afford. (App. at 98.) Valerie reasoned that she needed such a large home because she was raising three

8

children and one grandchild.  (App. at 25.)  The reason she gave Fielstra for rejecting a five-bedroom house owned by Memorial football and golf coach A.J. Rodino was that it was not big enough.  (App. at 96, 103, 485.)  At the IHSAA hearing, however, Valerie stated she found the home unsatisfactory because it was next to a liquor store.  (App. at 103.)  The Committee, however, concluded that a three-bedroom unit would have met Valerie's needs.  (App. at 108.)  It also pointed out that advertisements for rental units in South Bend that Valerie brought to the hearing predated those she brought for Elkhart rentals.  (App. at 108.)

The Committee found "no compelling reasons for the transfer of schools," that the decision to move to the Washington district met the family's real objective of Jasmine attending Washington and playing on the basketball team, and "that this decision was an athletic one and that the move and enrollment at South Bend Washington was for primarily athletic reasons in violation of Rule 19-4." (App. at 109.)  It also pointed out that, with Jasmine's senior rights, she could still enroll at Memorial, "the high school she has always attended, the school where her friends and teammates attend and the school at which she has played basketball and been a part of a successful program."  (App. at 109–10.)  See Ind. Code § 20-26-11-2(8) (2007).  The Committee summarized its reasons for suspecting the family's motives:

> [N]othing really forced Jasmine to enroll at South Bend Washington, unless this student wanted to join a basketball program which, in 2007, beat Elkhart Memorial in the tournament and finished State runner-up, the program which has won the state championship, the program where Jasmine would 'get the ball more,' the program where Jasmine would work harder, the program where Jasmine would be seen by elite college recruiters, and finally, the program where Jasmine would get her state championship ring.

(App. at 109.)

Valerie, on Jasmine's behalf, sued to for judicial review of the IHSAA decision.[3]  She also sought a preliminary injunction preventing the IHSAA from enforcing its decision.  (App. at

---

[3] IHSAA Rule 17-10.1, Right to Review of Final Association Decision by Parent of a Student, provides for court review.  (App. at 6.)

9

50–86.)  On December 16, 2008, the trial court held a hearing to consider the injunction.  The Watsons presented one exhibit and five witnesses, including Valerie and Jasmine.  The court found that the IHSAA decision was arbitrary and capricious, and therefore the Watsons would be likely to succeed on the merits at trial.  (App. at 44.)  It granted the injunction.

In coming to these conclusions, the court found that the IHSAA disregarded evidence, that it did not support hearsay testimony with any additional evidence, and that several witnesses denied statements or actions alleged by others.  (App. at 21–22, 25, 32.)  For instance, Jasmine denied admitting to anyone that Scott had been recruiting her.  (App. at 24.)  Valerie denied threatening to take Jasmine to Washington.  (App. at 100.)  Scott and his assistant similarly denied all allegations of recruiting.  (App. at 100–01, 104.)  The IHSAA based its findings on these events at least partly on Fielstra's testimony at the IHSAA hearing.  (App. at 92–95 (Butler coach, Jasmine said she would use her grandmother's address to transfer to Washington, Washington coach bragging about getting Jasmine, Jasmine admitting Scott recruited her, mother's statement about pushing Jasmine, Valerie telling Hunt she needed help and Jasmine needed the ball more).)  Fielstra was supported on some of these by the testimony of two Memorial players: Mercedes Dues and Javanda Ruff.  (App. at 93 (Jasmine told Dues she wanted to go to Washington, Ruff saw Scott pull Jasmine aside "several times" to talk about transferring and heard Scott tell Jasmine she would have better chance of being recruited by elite colleges at Washington), 102 (Ruff told Dues that Scott said Washington best for her), 494 (Jasmine stated Scott recruited her).

The court apparently discredited Fielstra's testimony and that of two of Jasmine's teammates at Memorial because they admitted "they were mad and/or disappointed that Jasmine had transferred to South Bend Washington."  (App. at 24.)  The court also seems to have discredited the players' testimonies because Fielstra had solicited them.  (App. at 12, 24.)  The trial court similarly noted that much of Fielstra's and some of Dues's and Ruff's testimonies were hearsay or double hearsay and credited others' versions of events.  (App. at 21–22, 25, 32.)  The court found the IHSAA's conclusions were arbitrary and capricious because it based them

10

"on hearsay statements, primarily provided by Fielstra," and Memorial players and coaches, who again stated they were upset that Jasmine had left. (App. at 32.)

On the other hand, the court accepted Valerie's explanations for several alleged comments. For instance, it accepted her explanation that she did not find the five-bedroom home satisfactory because it was next to a liquor store, not because it was too small. (App. at 25.) Similarly, it accepted her version of Fielstra's July 18 visit to her home, in which she explained that she had meant that she had spoken with Washington coaches about transferring Jasmine's stats to any other school, not necessarily to Washington. (App. at 25.)

Further, the court found the IHSAA disregarded the difficulties Valerie would face if she had to drive Jasmine from South Bend to Elkhart for school, as the Committee suggested Jasmine utilize her senior rights to attend Memorial. (App. at 30.) Valerie begins work, when she works, at 5a.m. and leaves at 11 a.m. The court also noted that this burden would be in addition to meeting the transportation needs of Valerie's other children. (App. at 30.)

On the subject of Valerie's options, the court noted that Valerie considered homes in Elkhart, Mishawaka, and South Bend. (App. at 9–10.) It accepted Valerie's explanation that she chose the west side of South Bend because she had grown up there and her extended family remains there. The court discounted the importance of allegations that Scott recruited Jasmine because it said "Valerie Watson, not Jasmine, made the decision to move." (App. at 28.) Instead, it concluded that she did so "for economic and family reasons, not because of any recruitment efforts allegedly made by Coach Scott." (App. at 28.) The court also found that the "alleged statements made by Mo Scott to Jasmine Watson had no effect on Val Watson's decision to move her family to South Bend." (App. at 24.)

11

The IHSAA appealed, and South Bend intervened on the Watsons' behalf.[4]  A divided Court of Appeals affirmed the trial court.  Indiana High School Athletic Association v. Watson, 913 N.E.2d 741 (Ind. Ct. App. 2009).

## Standard of Review

Although the IHSAA is a private, membership organization, Indiana courts review student challenges to its rules and determinations.  IHSAA v. Carlberg, 694 N.E.2d 222 (Ind. 1997).  Under common law, Indiana courts have reviewed the IHSAA's regulation of student-athletes in a manner analogous to the review of administrative agencies.  Carlberg, 694 N.E.2d at 228.  The courts therefore do not review IHSAA decisions de novo and do not substitute their judgment for the association's.  Carlberg, 694 N.E.2d at 231.  Instead, courts apply an arbitrary and capricious standard to review IHSAA decisions.  Carlberg, 694 N.E.2d at 230–31.  They analyze the record as a whole to determine whether substantial evidence supports the IHSAA's findings.  Carlberg, 694 N.E.2d at 233.  They generally do not engage in their own fact-finding. Id. (could only present evidence that IHSAA failed to follow its rules, that student could not present at hearing, pertaining to IHSAA proceedings, or the omission of which not by choice or neglect).  Appellate courts apply the same standard in reviewing a trial court's judgment.[5] IHSAA v. Reyes, 659 N.E.2d 158, 163–64 (Ind. Ct. App. 1995) summarily affirmed, 694 N.E.2d 249, 253 (Ind. 1997).  The legislature has now largely codified this "administrative law" approach.  Ind. Code § 20-26-14-5.5 et. seq.

An IHSAA determination is arbitrary and capricious 'only where it is willful and unreasonable, without consideration and in disregard of the facts or circumstances in the case, or without some basis which would lead a reasonable and honest person to the same conclusion.'

---

[4] Jasmine has since graduated and gone to the University of Massachusetts.  Under the IHSAA's Restitution Rule (Rule 17-6—Participation by Virtue of Court Action), the team's achievements made during Jasmine's time playing for Washington could be vacated if the IHSAA's appeal is successful.  (App. at 589.)

[5] The Court of Appeals wrongly applied an abuse of discretion standard, treating this as an ordinary preliminary injunction.  Watson, 913 N.E.2d at 751 (quoting Indiana High School Athletic Association v. Durham, 748 N.E.2d 404, 410–11 (Ind. Ct. App. 2001)).

Carlberg, 694 N.E.2d at 233 (quoting Dep't of Natural Res. v. Ind. Coal Council, Inc., 542 N.E.2d 1000, 1007). Where IHSAA findings of fact are supported by substantial evidence, we will not find them to be arbitrary and capricious. IHSAA v. Reyes, 659 N.E.2d at 163. Evidence meets this standard when it is more than a scintilla; that is, reasonable minds might accept it as adequate to support the conclusion. Midwest Minerals, Inc. v. Bd. of Zoning Appeals of Area Plan Dep't/Comm'n of Vigo County, 880 N.E.2d 1264, 1269 (Ind. Ct. App. 2008). It need not reach the level of preponderance. Id.

## I. The IHSAA's Decision Was Not Arbitrary and Capricious.[6]

In evaluating whether substantial evidence exists, a court must not reverse "simply because we may have reached a different result" than the reviewed agency. Filter Specialists, Inc. v. Brooks, 906 N.E.2d 835, 844 (Ind. 2009). Instead, the court "must uphold the organization's findings if it is supported by any substantial evidence." Reyes, 659 N.E.2d at 163.

The numerous statements by Jasmine, Valerie, Jasmine's grandmother, and others support the IHSAA's conclusion that the family contemplated moving to South Bend long before the family's home was foreclosed, let alone before Valerie claimed inability to find satisfactory housing in Elkhart. (App. at 92–95, 101.) Similarly, several witnesses attested to Scott's recruitment of Jasmine. (App. at 93–94, 102.) Reading the record in the light most favorable to the IHSAA's determinations, substantial evidence supports each of the IHSAA's conclusions. See Regester v. Ind. State Bd. of Nursing, 703 N.E.2d 147 (Ind. 1998) (court reads record in light most favorable to administrative proceedings and does not disturb agency's conclusions if substantial evidence supports them).

The trial court repeatedly favored testimony from the Watsons and Washington coaches, pointing out that the IHSAA's version of events heavily relied on hearsay. Of course, we held long ago that agency decisions may be based in part on hearsay. C.T.S. Corp. v. Schoulton, 270

---

[6] Because Jasmine has already participated in her senior basketball season and graduated, some might consider this a moot case. We summarily affirm the Court of Appeals rationale on this point under Ind. Appellate Rule 58(A).

13

Ind. 34, 383 N.E.2d 293 (1978). It is therefore within the IHSAA's purview to consider both direct and indirect evidence and weigh it for what it is worth. In this case, it considered all evidence, including the hearsay testimony, and found the evidence pointing toward a primarily athletic reason to move more credible than evidence to the contrary. The trial court labeled this "disregarding" the evidence, but it was well within the IHSAA's discretion. Instead, the trial court improperly reconsidered the evidence in light of the fact that some was presented through hearsay testimony.

South Bend Community School Corporation points out that "[a]n administrative decision may be based on hearsay when there is no objection, but there still must be a 'residuum of legal evidence to support the claim.'" (Intervenor's Br. at 28–29 (quoting Schoulton, 270 Ind. at 38, 383 N.E.2d at 295).) We do not question this concept but conclude that substantial evidence supports each of the IHSAA's conclusions.

South Bend argues, and the trial court concluded, that the IHSAA's decision inconsistently applied Rule 20 by ignoring the undue influence of the two Memorial coaches. (App. at 26, 45; Intervenor's Br. at 17–21.) It cites Crane v. Ind. High Sch. Athletic Ass'n, 975 F.2d 1315, 1325 (7th Cir. 1992) (IHSAA cannot apply its rules arbitrarily). The IHSAA responds that "[a]ny issue as to whether Elkhart Memorial violated the Undue Influence Rule is irrelevant to whether Jasmine's transfer violated that rule or the Transfer Rule." (Appellant's Br. at 30.) It further argues that "[t]he Undue Influence Rule applies to students and applies to schools, and proof of a violation of the rule can result in sanctions against either the student involved, or against the member school or schools involved." (Appellant's Br. at 39.) It characterizes the current proceeding as one determining whether to grant or to deny Jasmine's transfer, not whether to sanction one of the two high schools involved. (Appellant's Br. at 39–40.) The IHSAA also asserts that for Jasmine to succeed in a Crane claim, she must offer evidence of the IHSAA applying the rule inconsistently to other students, which she has not done. (Appellant's Br. at 40.)

To be sure, the IHSAA's decision about Jasmine's transfer necessarily implicates Scott. Still, it has not decided that Washington should be penalized as a school for those actions any more than it has determined that Price and Fielstra did not violate Rule 20. It could potentially decide both of these issues in the future, but it has not yet done so. The issue is whether the decision is inconsistent as it stands today, and on that we do not have any evidence relating to whether the IHSAA treated these coaches consistently with how it has treated other coaches in similar situations. While one could imagine a prosecutor or regulator charging everyone in sight, it is also plausible that this regulator, defending itself against Jasmine's suit over twenty-four months, might elect to let the litigation run its course before deciding what to do next.

While the IHSAA may not enforce its rules with arbitrary inconsistency, it must possess a level of discretion in sanctioning schools and athletes based on the language in the rules, the evidence available, and the overall justice of the situation.

The trial court announced that it applied the arbitrary and capricious standard, but it proceeded to reweigh evidence the IHSAA had already evaluated. In most of its findings, the court cites to evidence that contradicts the IHSAA's evidence. While courts must consider whether contradictory evidence completely invalidates evidence supporting the IHSAA's conclusions, they must not find the existence of contradictory evidence allowing for a reasonable debate to constitute a lack of substantial evidence. See Filter Specialists, Inc. v. Brooks, 906 N.E.2d 835, 844 (Ind. 2009) (courts look for substantial evidence supporting agency's factual findings). Here, the IHSAA considered each witness's version of events, assessed the credibility of the evidence, and concluded that Jasmine's transfer was primarily for athletic reasons. The facts, even as they are described in the IHSAA's ruling, could lead a reasonable person to disagree with its conclusions, but that does not make them arbitrary or capricious.

Rather than inquiring whether substantial evidence existed to support the ruling, the court substituted its own judgment for the IHSAA's. It rejected the IHSAA's assessment of several witnesses, concluded that the IHSAA incorrectly assessed evidence contrary to the ruling, and improperly discredited virtually all hearsay evidence.

## Conclusion

We reverse the trial court.


Sullivan, and David, JJ., concur.
Dickson, J., dissents with separate opinion in which Rucker, J., concurs.

**Dickson, Justice, dissenting.**

The trial court in this case was convinced that the Indiana High School Athletic Association ("IHSAA") erroneously attempted to prohibit Jasmine Watson from participating in athletics during her senior year at South Bend Washington High School and that the IHSAA's decision was arbitrary and capricious. As a result Judge David Matsey, serving as a special judge brought in from outside St. Joseph County, enjoined enforcement of the IHSAA decision in a comprehensive, 47-page decision that included 151 detailed findings of fact and 26 conclusions of law. The Court of Appeals agreed and affirmed, emphasizing that there was "no evidence in the record whatsoever that Jasmine violated any IHSAA eligibility rules." Ind. High Sch. Athletic Ass'n, Inc. v. Watson, 913 N.E.2d 741, 757 (Ind. Ct. App. 2009). Undaunted, the IHSAA sought transfer to this Court. In the meantime, Jasmine completed her senior year at Washington High School and graduated. And after the Court of Appeals decision and the filing of the IHSAA's transfer petition, the Indiana General Assembly enacted legislation requiring that in the future such disputes be submitted to an independent, outside review panel with enhanced powers to reverse, modify, or affirm IHSAA rulings. The new legislation effectively removes from the IHSAA the ultimate interpretation and application of IHSAA rules affecting a student's athletic eligibility. Because Jasmine has graduated and the procedure for review of IHSAA decisions has been altered by statute for all future cases, this appeal is moot and thus should be dismissed.

A majority of this Court prefers not only to take jurisdiction but also to apply this Court's recent decisions that virtually immunize IHSAA decisions from meaningful judicial review. I strongly disagree. The IHSAA's rules and enforcement practices impinge upon parental authority and responsibility to select the schools most appropriate for the interests and talents of their children. And the IHSAA's policies and actions can also, as here, engulf students whose change of schools is motivated or compelled by personal circumstances not principally related to athletic considerations. The IHSAA's robust enforcement of its rules and policies often produces an understandably intense reaction from affected student athletes and parents who are seeking to develop and maximize the student's talents and, if possible, employ such gifts to facilitate college admission and financial aid. When the IHSAA declares a student ineligible for varsity

athletic competition, the "now or never" consequences upon the student and parents can be catastrophic to the career opportunities of the student athlete who may as a result lose a crucial year—often the senior year—of athletic development and exposure to college athletic recruiters. Parents and students disagreeing with the IHSAA actions, such as the plaintiffs here, often turn to Indiana courts for immediate injunctive relief.

But when such relief has been granted by our trial courts, upon appellate review, this Court has for the past decade been extremely deferential to the IHSAA's decision-making and has refused to invalidate its decisions as arbitrary or capricious. Not surprisingly, legislative intervention has ensued. After our opinions in Indiana High School Athletic Ass'n, Inc. v. Carlberg, 694 N.E.2d 222 (Ind. 1997), and Indiana High School Athletic Ass'n, Inc. v. Reyes, 694 N.E.2d 249 (Ind. 1997), the Indiana General Assembly in 2000 enacted a special optional procedure permitting aggrieved parents to seek review by a nine-member case review panel[1] independent from IHSAA control and appointed by the State Superintendent of Public Instruction. *See* Ind. Code § 20-26-14-6 (formerly § 20-5-63-7). Because the case review panel is expressly authorized to "[c]ollect testimony and information on the case," Ind. Code § 20-26-14-6(c)(1), the statute empowers the panel to make determinations *de novo* rather than to review deferentially IHSAA rulings and actions. Jasmine Watson and her mother did not utilize this optional procedure but rather elected to seek and obtain immediate judicial injunctive relief from the IHSAA's decision to enable Jasmine's athletic participation during her senior year. (Appellant's Br. at 47.)

After the Court of Appeals affirmed the injunctive relief and the IHSAA filed its request for this Court to accept jurisdiction, the legislature reacted swiftly and on March 18, 2010, by a unanimous vote in both houses, modified the statutory optional independent review panel procedure to make it mandatory in future cases. Ind. Code § 20-26-14-6(b); *see also* 2010 Ind. Acts 1095–99. The 2010 amendment also provides that a parent or the IHSAA may appeal a decision of the case review panel by filing a legal action. In such an action, the statute authorizes

---

[1] The members of the panel are the State Superintendent of Public Instruction, or a designee, as chairperson, plus four parents of high school students, two high school principals, and two high school athletic directors. Ind. Code § 20-26-14-6(a) (formerly § 20-5-63-7(a)).

the trial court to affirm, modify, or reverse the panel's decision on any one of six grounds[2] based "upon its own review of the facts and issues involved." Ind. Code § 20-26-14-7(c). It is significant that, upon such judicial review, the trial court is not reviewing the basis of the IHSAA's ruling but rather that of the independent case review panel, thus further confirming the de novo nature of the panel's function. The legislature has interceded and stripped from the IHSAA its previous power to make unilateral student athletic eligibility determinations that had become shielded from meaningful judicial intervention.

As noted above, I believe that this appeal should be dismissed because the student athlete has graduated from high school and because our legislature has intervened and now requires that challenges to IHSAA eligibility rulings be redetermined by an independent case review panel. Because the majority disagrees and has chosen to take jurisdiction and to reverse the trial court, I further dissent, believing that the trial court judge and the Court of Appeals were correct and should be affirmed. Writing for the Court of Appeals, Chief Judge Baker, seeking to "observe the forest, rather than the trees," summarized the salient facts as follows:

> Over the course of two years, Valerie—a single mother supporting three children and one grandchild—had a salary that was nearly halved and a work schedule that was drastically curtailed because of our struggling economy. She struggled to pay her bills, began using food stamps, and, finally, stopped making regular mortgage payments. She received a notice of foreclosure in the summertime. Though she could have remained in the home for several more months, she chose to move so that her children would not have to be uprooted in the middle of the school year. She searched for a suitable home in Elkhart but was unable to find one that would accept her as a tenant with a low credit rating. She also searched in South Bend and finally found a home that was big enough, in a safe location, within her price range, and close enough to her extended family that they could lend much needed

---

[2] A decision of the independent case review panel may be reversed by the trial court if the court determines that the panel's decision is:

(1) not a fair and logical interpretation or application of the association's rule;
(2) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(3) contrary to a constitutional right, power, privilege, or immunity;
(4) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(5) without observance of procedure required by law; or
(6) unsupported by substantial evidence.

Ind. Code § 20-26-14-7(c).

3

support to the struggling family.

And what does the IHSAA believe she should have done instead? Among other things, the IHSAA seems to have concluded that the better course for Valerie would have been to have: (1) remained in her foreclosed home until she was kicked out, presumably to give herself a longer period of time to find a home in Elkhart, notwithstanding the risk she was running that her children would have had to transfer schools in the middle of the school year; (2) settled for a home in Elkhart that was too small, too expensive, or situated right next to a liquor store; (3) permitted her teenage daughter to live with her basketball coach, in another town; (4) drastically rearranged her life and minimized the needs of her other children, her grandchild, and herself, spending her precious free time driving Jasmine to and from a school located in another town; and/or (5) overlooked the ready, willing, and able family members located in South Bend who were able to provide much needed assistance to the Watsons.

The standard that the IHSAA applied to the Watsons was unreasonable, untenable, and unrealistic. Even if we assumed all of the IHSAA's evidence to be true, we cannot find that the trial court erred by concluding that the evidence in the record does not, in any way, establish that this move occurred for *primarily* athletic reasons. It is certainly possible that athletics played a role, but to say that athletics played a *primary* role is to ignore and disregard the evidence in the record that this family was struggling and that Valerie did what she believed to be the best thing for her children. The IHSAA found Valerie's decision to be "unusual." Appellant's App. p. 711. Perhaps it was, but only because she found herself in unusually trying circumstances.

We find that the record amply supports the trial court's conclusions that the IHSAA's conduct rose to the level of willful and unreasonable decision-making that was in disregard of the facts and circumstances before it and that, consequently, it acted arbitrarily and capriciously.

Watson, 913 N.E.2d at 755–56. I wholeheartedly agree and believe that we should affirm the trial court's preliminary injunction restraining the IHSAA's action against Jasmine Watson.

Rucker, J., concurs.