**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jun 27 2013, 9:11 am

CLERK
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE:

**C.S.**
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHY BRADLEY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| C.S., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 93A02-1209-EX-774 |
| | ) | |
| REVIEW BOARD OF THE INDIANA | ) | |
| DEPARTMENT OF WORKFORCE | ) | |
| DEVELOPMENT, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE REVIEW BOARD OF THE DEPARTMENT OF
WORKFORCE DEVELOPMENT
Cause No. 12-R-2780

**June 27, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

C.S. appeals the denial of unemployment compensation benefits by the Review Board of the Department of Workforce Development ("the Review Board"). We affirm.

**Issue**

C.S. raises two issues, which we combine and restate as whether there is sufficient evidence to support the Review Board's determination that C.S. voluntarily quit his employment without good cause.

**Facts**

The evidence most favorable to the Review Board's ruling is that C.S. worked as an apartment leasing manager for the Employer from March 2010 through April 2012. His immediate supervisor was L.P., and L.P.'s supervisor was A.N. During the course of his employment, C.S. became aware that another leasing manager who worked for the Employer at a different apartment complex was being paid hourly, was permitted to work a flexible schedule to accommodate her school schedule, and was provided an apartment at the complex in exchange for reduced pay. C.S. believed he was being treated unfairly in that he was salaried (and did not earn overtime pay), was not permitted to work a flexible schedule, and was not offered an apartment to live in. C.S. brought these concerns to A.N., who explained that the different pay and schedule structure for the other employee was due to differences in the nature and needs of the two offices, including that C.S. had more people working for him. A.N. also discussed making an

apartment available to C.S., but he was uninterested in the type of apartment she was offering.

C.S. also believed that his job duties were unfairly expanded without additional pay while he was employed. He brought his concerns to L.P., who responded by reading a generic job description out loud to C.S. and laughing as she concluded by telling C.S. that he would do anything she told him to do. C.S. continued working after this incident.

L.P. frequently berated C.S. verbally. Other employees often heard L.P. screaming at C.S. in her office. On other occasions, L.P. would tell C.S.'s subordinates about mistakes he had made, laughing as she did so. L.P. also sometimes engaged in conversations that were sexual in nature that C.S. found inappropriate. L.P. often called C.S. a "drama queen," to his face and to other employees behind his back. Tr. p. 67. On one occasion, C.S. told L.P. he had to leave work because he had defecated in his pants due to a medical problem, and L.P. told everyone else in the office what had happened and laughed about it. L.P. once responded to an email from C.S. by telling him to "bite me." Id. at 34. A tree once fell on C.S.'s car at work, and L.P. laughed at him and told him the tree would not be moved. C.S. also believed L.P. did not respond appropriately to potential safety threats at the apartment complex they managed.

For the most part, C.S. did not complain to L.P. about her treatment of him, nor did he report L.P.'s behavior to A.N. or anyone else at the Employer. On one occasion, however, C.S. did complain to A.N. about L.P.'s response to him when he reported a fire at the apartment complex to L.P., in which L.P. again called C.S. a "drama queen." Id. at

3

17. A.N. responded that L.P. "lets her emotions get in the way sometimes, she's too emotional, that she's under a lot of stress and that [C.S.] was to let [A.N.] know if it continued or anything else happened . . . ." Id. at 18. A.N. took no further action regarding C.S.'s complaint, nor does it appear C.S. again discussed L.P.'s treatment of him with A.N.

L.P.'s treatment of C.S. was causing him stress to the extent that he was having health problems that he discussed with his doctor. The doctor advised C.S. that he should "look into something different" work-wise. Id. at 37. However, C.S. never advised L.P., A.N., or anyone else at the Employer of the medical problems L.P.'s behavior was causing him, nor did he provide any documentation of such problems to the Employer or the Review Board.

C.S. voluntarily quit his job in April 2012. At that time, C.S. told L.P. and A.N. that he was quitting so that he could go back to school full time. He did not mention having personal or medical/mental health problems that led him to quit.

C.S. applied to receive unemployment compensation benefits. On June 6, 2012, a claims deputy determined that C.S. was not entitled to benefits because he had voluntarily left his job without good cause. C.S. appealed. At the hearing before the administrative law judge ("ALJ"), the Employer several times mentioned a company handbook that supposedly contained procedures for an employee to complain about mistreatment by a supervisor, but the Employer did not introduce a copy of the handbook into evidence and the ALJ forbade direct discussion of it. However, C.S. and L.P. agreed

4

as to their understanding that an employee could or should report mistreatment by a supervisor to that person's supervisor, which would have been A.N.

On July 20, 2012, the ALJ issued an order affirming the deputy's denial of benefits. The ALJ found that L.P.'s treatment of C.S. was "unreasonable," "severe and pervasive," and "that it endangered claimant's mental health." App. p. 73. However, the ALJ also found that C.S. had failed to adequately notify A.N. of the extent of L.P.'s mistreatment and to give the Employer an opportunity to resolve the situation, and so found that C.S. did not have good cause for voluntarily quitting his job. On August 28, 2012, the Review Board adopted and affirmed the ALJ's decision. C.S. now appeals.

### Analysis

A decision by the Review Board is "'conclusive and binding as to all questions of fact.'" Chrysler Group, LLC v. Review Bd. of Indiana Dep't of Workforce Dev., 960 N.E.2d 118, 122 (Ind. 2012) (quoting Ind. Code § 22-4-17-12(a)). Its conclusions of law "may be challenged as to 'the sufficiency of the facts found to sustain the decision and the sufficiency of the evidence to sustain the findings of fact.'" Id. (quoting I.C. § 22-4-17-12(f)). On appeal, we categorize the Review Board's findings as follows: "(1) basic, underlying facts; (2) 'ultimate facts' derived as inferences or conclusions from basic, underlying facts; (3) and conclusions of law." Id.

We review findings of basic facts under a "substantial evidence" standard, meaning we neither reweigh the evidence nor assess the credibility of witnesses. Id. We consider only the evidence most favorable to the findings and treat those findings as

conclusive and binding, unless the evidence "was devoid of probative value," or "was so proportionally meager as to lead to the conviction that the finding does not rest upon a rational basis," or the proceedings were unduly influenced, fraudulent, or arbitrary. Id. at 122 n.2 (quoting McClain v. Review Bd. of Indiana Dep't of Workforce Dev., 693 N.E.2d 1314, 1317 n.2 (Ind. 1998)).

We review ultimate facts—or mixed questions of fact and law—to ensure the Review Board has drawn a reasonable inference in light of its findings on the basic, underlying facts. Id. at 122. We defer more to the decision of an administrative agency such as the Review Board when a matter lies within its particular expertise, but we are more likely to exercise our own judgment when the matter does not lie within the agency's particular expertise. Id. at 122-23. We must reverse a decision of the Review Board "'if the underlying facts are not supported by substantial evidence or the logic of the inference is faulty, even where the agency acts within its expertise, or if the agency proceeds under an incorrect view of the law.'" Id. at 123 (quoting McClain, 693 N.E.2d at 1318).

We are not bound by the Review Board's conclusions of law. Id. However, we will give great weight to an interpretation of a statute by an administrative agency charged with enforcing the statute, unless such interpretation would be inconsistent with the statute itself. Id. This same rule of deference applies to agency interpretation of administrative regulations that it has drafted and is charged with enforcing. State Bd. of

6

Tax Comm'rs v. Two Market Square Assocs. Ltd. P'ship, 679 N.E.2d 882, 886 (Ind. 1997).

"The purpose of the unemployment compensation act is to provide benefits to those who are involuntarily out of work, through no fault of their own, for reasons beyond their control." Wasylk v. Review Bd. of Ind. Employment Sec. Div., 454 N.E.2d 1243, 1245 (Ind. Ct. App. 1983). When an employer terminates an employee and the employee seeks unemployment benefits, the employer bears the initial burden of establishing that an employee was terminated for just cause and is not entitled to benefits. Coleman v. Review Bd. of Indiana Dep't of Workforce Dev., 905 N.E.2d 1015, 1019 (Ind. Ct. App. 2009). However, consistent with the purpose of unemployment compensation laws, a stricter standard is imposed on those, such as C.S., who voluntarily quit working. See Davis v. Review Bd. of Indiana Dep't of Workforce Dev., 900 N.E.2d 488, 492 (Ind. Ct. App. 2009). An employee who voluntarily leaves work without good cause in connection with the work is not entitled to unemployment benefits. Id. (citing I.C. § 22-4-15-1(a)). Whether an employee voluntarily quit working for good cause is a question of fact for the Review Board, and the employee bears the burden of establishing the existence of good cause. Id. To prove good cause for voluntary termination, an employee must establish both that the reasons for quitting were objectively related to the job, and that the working conditions were so unreasonable and unfair that a reasonably prudent person under similar circumstances would have felt compelled to terminate the employment. Id. The reason for quitting cannot be "personal and subjective." M & J

7

Management, Inc. v. Review Bd. of Dep't of Workforce Dev., 711 N.E.2d 58, 62 (Ind. Ct. App. 1999).

C.S. argues in part that the Review Board failed to address his claim that part of the reason he quit his job was because his job duties were increased without any corresponding increase in pay. However, even if C.S. did present some evidence on this point, we see no indication in the record that C.S. asked the Review Board to find that he had good cause to voluntarily quit his job because of this. In closing argument before the ALJ, C.S.'s attorney cited as good cause for his quitting a decline in his health caused by L.P.'s constant berating of him and the "hostile work environment" she created, as well as L.P.'s and the Employer's failure to respond to safety complaints at the apartment complex. Tr. p. 122. C.S.'s attorney also discussed whether the Employer had a policy for reporting complaints such as those that C.S. had about L.P. There was no mention of C.S. allegedly having quit because of increased job demands without corresponding increase in pay.

We have noted "that a party who fails to raise an issue before an administrative body has waived the issue on appeal." Cunningham v. Review Bd. of Indiana Dep't of Workforce Dev., 913 N.E.2d 203, 205 (Ind. Ct. App. 2009) (citing Nat'l Rural Utils. Coop. Fin. Corp. v. Pub. Serv. Comm'n of Ind., 552 N.E.2d 23, 28 (Ind. 1990)). We have not strictly adhered to this rule in unemployment cases where the evidence before the Review Board was simple and undisputed and resolution of the claims was solely a matter of drawing legal conclusions, not deciding factual conflicts. See Tokheim Corp.

8

v. Review Bd. of Indiana Employment Sec. Div., 440 N.E.2d 1141, 1142 (Ind. Ct. App. 1982). The evidence here by contrast was not simple and undisputed and the Review Board had to resolve factual conflicts and differing inferences from the evidence. We believe C.S. has waived his argument that he voluntarily quit for good cause based on the change in his job requirements.

In any event, unemployment compensation laws do not permit "employees to terminate their employment merely because working conditions are not entirely to their liking." Marozsan v. Review Bd. of Indiana Employment Sec. Div., 429 N.E.2d 986, 990 (Ind. Ct. App. 1982). Unemployment compensation for voluntarily quitting is justified "only when the demands placed upon employees are unreasonable or unfair, so much so that a reasonably prudent person would be impelled to leave . . . ." Id. C.S. has cited no authority for the proposition that the job changes he faced were so "unreasonable and unfair" that his voluntary termination was for just cause.

C.S. also argues that he presented evidence that working for the Employer, specifically suffering through L.P.'s frequent tirades, was harming his physical and mental health. The Review Board did, indeed, find that working for the Employer and L.P. had "endangered the claimant's mental health" and, moreover, "that the claimant was beginning to have health problems which appear to be related to the stress of work." App. p. 73. C.S. also presented his own testimony that his doctor had advised him to seek other employment because of the stress that his job was creating. However, the Review Board also noted that C.S. did not present any documentary evidence as to the

9

extent of his health problems, nor did he present any evidence that he advised the Employer of health difficulties caused by the stress of work or sought medical leave to attempt to address them.

In Winder v. Review Bd. of the Indiana Employment Sec. Div., 528 N.E.2d 854 (Ind. Ct. App. 1988), an employee voluntarily quit her employment because standing on the job had caused her feet, ankles, and legs to become swollen. Regardless, we affirmed the denial of unemployment benefits because there was no evidence the employee had informed the employer of her medical problems and so the employer had no opportunity to make other arrangements for the employee. We held, "for a medical reason to constitute good cause for quitting, an employee must substantiate the medical problem by showing the employer a doctor's statement." Winder, 528 N.E.2d at 856. Here, C.S. did not present any such statement to the Employer or any other evidence to the Employer that he was suffering from health problems. Therefore, the Employer was not aware of the extent of harm L.P.'s treatment may have been causing, nor was it given an opportunity to alleviate that harm. Under the circumstances, the mere fact that L.P.'s treatment may have been causing C.S. physical and mental harm was not enough by itself to establish that C.S.'s voluntary termination of employment was for good cause. See id.

The bulk of C.S.'s argument is directed towards L.P.'s harsh treatment of him and his claim that he either adequately advised the Employer of that treatment, or was not required to do so. Resolution of this issue turns upon a regulation promulgated by the Department of Workforce Development specifically designed to provide guidance as to

10

what constitutes sufficient evidence of good cause for voluntary termination of employment, and which states in part:

> A voluntary quit due to excessive discipline, or inappropriate comments or conduct by managers or coworkers, will not constitute good cause in connection with the work unless the claimant can establish that an individual in the same or similar circumstances would reasonably believe that the:
>
> (1)  conduct was severe and pervasive;
>
> (2)  conduct: . . .
>
> (C)  endangered the claimant's mental health; and
>
> (3)  claimant reported the conduct pursuant to the employer's procedures, if any, but no employer action was taken within a reasonable period of time.

646 Ind. Admin. Code 5-8-4(a). The Review Board specifically found, pursuant to this regulation, that L.P.'s conduct was both "severe and pervasive" and that it "endangered the claimant's mental health." App. p. 73. However, it also found that C.S. had failed, with the sole exception of reporting L.P.'s calling him a "drama queen" after he called L.P. to report a fire at the apartment complex, to make A.N. "aware of the extent of the problem and give her opportunity to resolve it as is required by subsection 3 of the above regulation . . . ." Id.

C.S. first argues that the Employer failed to prove that it had a policy for reporting inappropriate conduct by an employee's immediate supervisor and, thus, he did not have to comply with any reporting procedure before quitting. He notes that the Employer never submitted a copy of an employee handbook into evidence, even though the ALJ

11

forbade direct reference to such a handbook by the Employer unless it introduced it into evidence. The Review Board contends that subsection (3) of the regulation requires an employee to report inappropriate coworker or manager behavior to an employer and to provide an employer the opportunity to rectify the situation, regardless of whether there is any policy in place for reporting such behavior.

Even if we were to assume as C.S. argues that subsection (3) of the regulation only requires an employee to report inappropriate behavior in accordance with "official" employer policy, and that no reporting requirement exists if no such policy exists, that does not change the fact that an employee who has voluntarily quit work must prove the existence of good cause for quitting. In this context, that means that an employer does not have to prove the existence of a policy for reporting inappropriate behavior; rather, an employee bears the burden of proving that no such policy existed. Here, although no "official" Employer policy was introduced into evidence, C.S. and L.P. seemed to have a mutual understanding that if C.S. was having difficulties with L.P., that he could have raised them with L.P.'s supervisor, A.N. In fact, C.S. never testified that no policy existed; he instead repeatedly emphasized his belief that any reporting of L.P.'s conduct would have been fruitless. This evidence does not suffice to prove that the Employer had no procedures for reporting inappropriate co-worker or supervisor behavior.

C.S. also contends that, to the extent he had to inform the Employer of L.P.'s misconduct and thus provide it a reasonable opportunity to address her behavior, he adequately did so. The Review Board found that C.S. informed A.N. of L.P.'s

12

misbehavior on only one occasion, when he told A.N. that C.S. had called him a "drama queen" after calling L.P. to tell her about a fire at the apartment complex. A.N. in turn responded to this complaint by saying that L.P. "lets her emotions get in the way sometimes, she's too emotional, that she's under a lot of stress and that [C.S.] was to let [A.N.] know if it continued or anything else happened . . . ." Tr. at 18. A.N. took no further action regarding C.S.'s complaint.

C.S. argues that the Review Board erred by finding that A.N. was unaware that C.S. was gay and therefore she did not understand that calling him a "drama queen" was unreasonable. C.S. contends that his sexual orientation has little to no relevance on the appropriateness of calling a subordinate a "drama queen," nor did C.S. in his testimony indicate that he was offended by the term only because of his sexual orientation. Regardless, we believe that the remainder of the Review Board's finding—that this one instance of informing A.N. of an improper comment by L.P. was inadequate to put the Employer on notice of the extent of L.P.'s misconduct—was supported by the evidence. That is to say, informing A.N. of being called an inappropriate—but not vulgar—name on one occasion in the midst of one outburst did not sufficiently advise the Employer of the constant, repeated, and severe conduct exhibited by L.P. towards C.S.

C.S. also contends that there is insufficient evidence that he only told A.N. of L.P.'s inappropriate conduct on this one occasion or that he did not more extensively describe A.N.'s misbehavior on that occasion. In particular, C.S. argues, "No evidence . . . states that this is the only conversation that occurred between them about L.P."

13

Appellant's Br. p. 21. This argument, however, again erroneously shifts the burden of proof onto the Employer to prove that there was only one conversation; to the contrary, C.S. bore the burden of proving multiple conversations, if they indeed existed. Also, A.N. testified that she had a meeting with C.S. in August 2011 to discuss the concerns he had over his alleged disparate treatment as compared to the employee at the other apartment complex; A.N. did not recall C.S. raising any concerns, then or at another time, regarding L.P.'s inappropriate treatment of him. This supports the Review Board's finding of basic fact that C.S. did not sufficiently advise A.N. and the Employer of his ongoing inappropriate treatment at L.P.'s hands. To conclude otherwise would require us to reweigh the evidence, which we cannot do.

**Conclusion**

Although C.S. sufficiently proved to the Review Board's satisfaction that L.P.'s treatment of him was inappropriate, severe, persistent, and was causing him health problems, the evidence also is sufficient to support the Review Board's basic findings of fact that C.S. did not adequately advise the Employer of L.P.'s misconduct or his health problems. Those basic factual findings also support the Review Board's ultimate factual finding that C.S. did not have good cause to voluntarily terminate his employment. We affirm the denial of unemployment benefits.

Affirmed.

NAJAM, J., and BAILEY, J., concur.

14