ATTORNEYS FOR APPELLANT
Steven F. Pockrass
Robert F. Seidler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE,
REVIEW BOARD OF THE INDIANA
DEPARTMENT OF WORKFORCE
DEVELOPMENT
Gregory F. Zoeller
Attorney General of Indiana

Francis H. Barrow
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE,
T.A., ET AL.
Nora L. Macey
Barry A. Macey
Robert A. Hicks
Indianapolis, Indiana



FILED

Jan 19 2012, 9:48 am

CLERK
of the supreme court,
court of appeals and
tax court

## In the
# Indiana Supreme Court

No. 93S02-1109-EX-565

CHRYSLER GROUP, LLC,

*Appellant (Respondent below),*

v.

REVIEW BOARD OF THE INDIANA
DEPARTMENT OF WORKFORCE
DEVELOPMENT AND T.A., ET AL.,

*Appellee (Petitioners below).*

Appeal from the Review Board of the Indiana Department of Workforce Development,
No. (09-28378) 10-R-00621
Steven F. Bier, Chairperson; George H. Baker, Member; Lawrence A. Dailey, Member

On Petition to Transfer from the Indiana Court of Appeals, No. 93A02-1004-EX-441

**January 19, 2012**

**Shepard, Chief Justice.**

As the U.S. economy collapsed in 2008, Chrysler offered a buyout program to employees in Kokomo, Indiana. Those employees then applied for unemployment benefits under Indiana's Unemployment Compensation Act and their claims were initially denied. The Review Board of

the Indiana Department of Workforce Development ultimately awarded benefits under a narrow provision of the Act. While this provision has now been repealed, its application is a matter of real consequence to these parties. We affirm the Board.

**Facts and Procedural History**

In 2008, Chrysler Group, LLC—like the rest of the country—faced almost unprecedented economic challenges.[1] It closed manufacturing plants in multiple states and offered senior employees in those states the opportunity to relocate to plants still operating elsewhere— including Chrysler's plant in Kokomo. (Appellant's App. at 4.) Chrysler laid off some of its employees in Kokomo due to a decrease in work volume, and these workers received unemployment benefits, along with supplemental unemployment benefit pay ("sub-pay") and continuing health care coverage from Chrysler. (Appellant's App. at 4–5.)

Late in 2008, Chrysler offered any employee with at least one year of service—even if they were on lay-off—the opportunity to take part in an Enhanced Voluntary Termination of Employment Program (EVTEP). (Appellant's App. at 5.) The EVTEP buyout offered $100,000, plus continued health care benefits for six months, in exchange for the employee's voluntary termination of employment. A second EVTEP buyout in early 2009 offered $75,000, a $25,000 voucher toward the purchase of a new Chrysler, and health care benefits for six months. Employees who participated in either EVTEP relinquished all recall and seniority rights with Chrysler.

---

[1] Notwithstanding Indiana Code § 22-4-19-6 (2007 & Supp. 2011), the parties all identify Chrysler by name in their briefs; both counsel and the court identified Chrysler by name during oral argument. We see little merit in attempting to conceal the identity of a global automotive manufacturer that faced a massive economic collapse in 2008 and whose initials are "C.G." We will, however, continue to identify the individual claimants—if necessary to name them—by their initials.

The Indiana Department of Workforce Development then terminated unemployment benefits for those employees who had been on lay-off prior to accepting the EVTEP, and it denied unemployment benefits to those employees who had been actively working for Chrysler prior to accepting EVTEP. (Appellant's App. at 13.) Both groups of employees appealed to an administrative law judge, who determined that those employees who were on indefinite lay-off before accepting the EVTEP were entitled to continued unemployment benefits, whereas those who were actively working or on temporary lay-off were not. Chrysler and the employees then appealed to DWD's Review Board.

The Board reversed in part and affirmed in part. It saw no distinction between those employees on temporary lay-off versus indefinite lay-off, saying both were "inactively employed" at the time they accepted the EVTEP. (Appellant's App. at 5–6.) The Board further found that all employees who accepted the EVTEP were eligible for benefits pursuant to Indiana Code § 22-4-14-1(c) (Supp. 2011) despite a lack of good cause for leaving their employment.

In a divided opinion, the Court of Appeals reversed and held that the Board's application of Section 22-4-14-1(c) was erroneous and inconsistent with the statute. C.G., LLC v. Rev. Bd. of the Ind. Dep't of Workforce Dev., 946 N.E.2d 599, 603 (Ind. Ct. App. 2011). We granted transfer, ___ N.E.2d ___ (Ind. 2011) (table), thereby vacating the opinion of the Court of Appeals. Ind. Appellate Rule 58(A).

**Standard of Review**

Under Indiana's Unemployment Compensation Act, "[a]ny decision of the review board shall be conclusive and binding as to all questions of fact." Ind. Code § 22-4-17-12(a) (2007); McClain v. Review Bd. of Ind. Dep't of Workforce Dev., 693 N.E.2d 1314, 1316 (Ind. 1998). The Board's conclusions of law may be challenged as to "the sufficiency of the facts found to sustain the decision and the sufficiency of the evidence to sustain the findings of facts." Ind. Code § 22-4-17-12(f); McClain, 693 N.E.2d at 1317. Consistent with appellate review of other

3

administrative adjudications, we categorize the Board's findings three ways: (1) basic, underlying facts; (2) "ultimate facts" derived as inferences or conclusions from basic, underlying facts; (3) and conclusions of law. McLain, 693 N.E.2d at 1317.

We review the Board's findings of basic facts under a "substantial evidence" standard, and we neither reweigh the evidence nor assess its credibility. Id. We consider only the evidence most favorable to the Board's findings and, absent limited exceptions, treat those findings as conclusive and binding. Id. at 1317 n.2.[2]

Ultimate facts—typically mixed questions of fact and law—are reviewed to ensure the Board has drawn a reasonable inference in light of its findings on the basic, underlying facts. Id. at 1317–18. Where the matter lies within the particular expertise of the administrative agency, we afford the finding a greater level of deference. Id. at 1318. Where the matter does not lie within the particular expertise of the agency, however, "the reviewing court is more likely to exercise its own judgment." Id. Regardless, "the court examines the logic of the inference drawn and imposes any rules of law that may drive the result." Id. The Board's conclusion must be reversed "if the underlying facts are not supported by substantial evidence or the logic of the inference is faulty, even where the agency acts within its expertise, or if the agency proceeds under an incorrect view of the law." Id.

We are not bound by the Board's conclusions of law, though "[a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself." LTV Steel Co. v. Griffin, 730 N.E.2d 1251, 1257 (Ind. 2000).

---

[2] Such exceptions include if the evidence "was devoid of probative value," or "was so proportionally meager as to lead to the conviction that the finding does not rest upon a rational basis," or the result of the proceedings was unduly influenced, fraudulent, or arbitrary. McClain, 693 N.E.2d at 1317 n.2.

## Employees Who Accepted the EVTEP Are Eligible for Benefits

The purpose of Indiana's Unemployment Compensation Act is to "provide for payment of benefits to persons unemployed through no fault of their own." Ind. Code § 22-4-1-1 (2007); Indiana State Univ. v. LaFief, 888 N.E.2d 184, 186 (Ind. 2008). To receive benefits, a person "must be unemployed, have sufficient wage credits in his base period, be able, available, and actively seeking work, and meet certain registration and reporting requirements." LaFief, 888 N.E.2d at 186 (citing Ind. Code §§ 22-4-14-2, -3, -5(d)–(e) (2007 & Supp. 2011)). However, a person can be disqualified from benefits if he voluntarily terminates his employment without good cause. Id. (citing Ind. Code § 22-4-15-1 (2007 & Supp. 2011)).

Here, the Board found the employees met the qualification requirements of Sections 22-4-14-2, -3, and -5, but none had good cause to voluntarily terminate their employment. (Appellant's App. at 6.) In most cases this would end the claim, but the Board determined that the specific provisions of Indiana Code § 22-4-14-1(c) trumped the Act's more general disqualification provisions. (Appellant's App. at 6–7.) Subsection (c) provides that,

> [e]xcept as provided in IC 22-4-5-1, a person who:
>
> > (1) accepts an offer of payment or other compensation offered by an employer to avert or lessen the effect of a layoff or plant closure; and
> >
> > (2) otherwise meets the eligibility requirements established by this article;
>
> is entitled to receive benefits in the same amounts, under the same terms, and subject to the same conditions as any other unemployed person.

Ind. Code § 22-4-14-1(c).[3] The Board concluded that "the Employer offered—and the Claimants accepted—compensation to lessen or avert the effects of a lay-off, and the Claimants are entitled to benefits" pursuant to subsection (c). (Appellant's App. at 7.) Specifically, it said:

> Employees who were actively employed when they accepted the EVTEP averted the effects of a lay-off, and those employees who were laid off when they accepted the EVTEP lessened the effects of the lay-off. The Claimants received a cash payment to help them transition to other employment in a period of recession and uncertainty. Likewise, the Employer lessened the effects of the lay-off to itself when employees accepted the EVTEP by reducing its workforce when the recall rights were eliminated. The Employer's obligation to those employees for subpay ended immediately, and its obligation to continue health coverage ended after six months.

(Appellant's App. at 7.) Chrysler does not challenge the Board's findings of fact. Instead, Chrysler challenges the Board's interpretation and subsequent application of subsection (c), arguing that it is inapplicable to the employees' claims. (Appellant's Br. at 1.)

We therefore proceed in two steps. First, we examine Section 22-4-14-1(c) to determine whether the Board correctly interpreted the law. Second, we must determine whether the agency properly applied that law to the facts before it.

A. Interpretation of Section 22-4-14-1(c). We review an issue of statutory interpretation de novo. If the statutory language is clear and unambiguous, we require only that the words and phrases it contains are given their plain, ordinary, and usual meanings to determine and implement the legislature's intent. State v. Am. Family Voices, Inc., 898 N.E.2d 293 (Ind. 2008). However, this particular statute is one the Board is charged with enforcing, and we therefore give deference to its interpretation. LTV Steel, Co., 730 N.E.2d at 1257. In particular,

---

[3] This exception has since been closed. In 2011 the General Assembly amended subsection (c), limiting it to "initial claims for unemployment filed for a week that begins after March 14, 2008, and before October 1, 2011." Ind. Code § 22-4-14-1(c); Act of February 24, 2011, P.L. 2-2011, § 12, 2011 Ind. Acts 1, 26.

we defer to the agency's reasonable interpretation of such a statute even over an equally reasonable interpretation by another party. See Sullivan v. Day, 681 N.E.2d 713 (Ind. 1997).

Chrysler's argument, rephrased, is essentially two-fold. First, it says the statute must be interpreted to apply only when the employer intended to offer the payment as a way to avert or lessen the effect of a lay-off or plant closure (as opposed to the employee accepting the offer with that intent). (Appellant's Br. at 20–21.) Second, it urges that the statute applies only when that intent is expressly made known through a previously announced decision to lay off specific employees or to close a particular plant. (Appellant's Br. at 15–20.)

As to the first issue, we see nothing in the Board's conclusions indicating that it took a particular view one way or the other. Chrysler argues that the Board's order held that "subjective and speculative fears of layoff or plant closure are sufficient to invoke I.C. § 22-4-14-1(c)" (Appellant's Br. at 20), but this is a mischaracterization of the Board's holding. To be sure, the Board found the employees' beliefs that Chrysler might discontinue its operations, or that they would be replaced by more senior employees laid-off from other plants, were "speculative in nature and [were] not good cause reasons to leave one's employment." (Appellant's App. at 6.) However, this finding was made in the course of the Board's analysis of the general disqualification provisions of Section 22-4-15-1(a); it was not the basis for the Board's conclusion about Section 22-4-14-1(c). (Appellant's App. at 7.)

We agree with Chrysler that the plain language of the statute requires the desire to avert or lessen the effect of a lay-off or plant closure be viewed from the perspective of the employer. To do otherwise would authorize claimants to deploy speculative fears about a potential lay-off or closure as an end-around to the general rule that "an individual who has voluntarily left . . . employment without good cause in connection with the work" is ineligible for unemployment benefits. Ind. Code § 22-4-15-1(a); cf. Geckler v. Rev. Bd. of Indiana Emp't Sec. Div., 244 Ind. 473, 477–78, 193 N.E.2d 357, 359 (1963) (good cause must be related to the employment, objective in nature, and does not encompass "purely personal and subjective reasons which are unique to the employee"). Such would cause the narrower exception of Section 22-4-14-1(c) to

7

swallow Section 22-4-15-1(a)'s general rule, and be inconsistent with the Act's overall purpose to "provide for payment of benefits to persons unemployed through no fault of their own." Ind. Code § 22-4-1-1.

Chrysler's second argument—that the employer must explicitly announce the particular lay-offs or plant closure—is based on an extension of the decision in Trelleborg YSH, Inc. v. Bd. of Ind. Dep't of Workforce Dev., 798 N.E.2d 484 (Ind. Ct. App. 2003). Chrysler contends the Board did not apply Trelleborg properly, and that a proper application commands reversal.

Chrysler argues that "the Review Board stated that although an inverse seniority provision is not at issue here, the Court of Appeals' analysis and treatment of the inverse seniority provision in Trelleborg is relevant to the ultimate resolution of this case." (Appellant's Br. at 16.) If that is the case, Chrysler says, the Board "failed to adequately consider several key points of the Trelleborg analysis that require a ruling in favor of Chrysler Group LLC." (Appellant's Br. at 16.) We think this mischaracterizes the Board's decision.

It is true that the Board relied on Trelleborg. But only for the Trelleborg holding that the inverse seniority provision of Section 22-4-14-1(b) "'prevail[ed] over the disqualification provision' of Indiana Code section 22-4-15-1." (Appellant's App. at 6–7) (quoting Trelleborg, 798 N.E.2d at 489). Thus, the Board similarly determined that Section 22-4-14-1(c) likewise prevailed over Section 22-4-15-1. (Appellant's App. at 7.) In doing so, the Board did not imply, nor does Trelleborg require, that any substantive requirements for Section 22-4-14-1(b) apply to Section 22-4-14-1(c).

The "key points of the Trelleborg analysis" that Chrysler would have us apply to Section 22-4-14-1(c) are that "the employer clearly must have first made and announced a decision to lay off certain employees or to close a plant," and that decision "is what triggers potential employee eligibility and employer liability for unemployment." (Appellant's Br. at 16, 18.)

In Trelleborg, the employer announced that it was placing employees on permanent lay-off as a result of a "downturn of business," and that an optional (non-permanent) lay-off would be available for certain employees based on their seniority with the employer. Trelleborg, 798 N.E.2d at 485–86. An employee who qualified for the optional lay-off requested it and, after her employer granted the request, applied for unemployment benefits. Id. at 486. Her claim was denied; an ALJ and the Board subsequently held that she was entitled to benefits for the period of her unemployment in which she was making an effort to secure full-time work. Id.

The employer appealed, and the Court of Appeals affirmed. Id. at 485. Though neither the ALJ nor the Board expressly applied Section 22-4-14-1(b) to the employee's claim, the court considered it implicit in the agency decision.[4] Id. at 487–88. After determining that the optional lay-off qualified as "an inverse seniority clause of a validly negotiated contract" pursuant to subsection (b), the Trelleborg court went on to hold that subsection (b) trumped the general disqualification provisions of Section 22-4-15-1. Id. at 489–90.

Chrysler overstates the importance of the Trelleborg employer's express statement of intent. Nowhere does Trelleborg hold that a requirement for applying Section 22-4-14-1(b) is an express and indisputable statement by the employer to lay off some of its employees. While that was a factual circumstance of Trelleborg, the court's actual holding was merely that where there is "an individual whose unemployment is due to a layoff by the employer," and that individual was otherwise-qualified under Section 22-4-14-1(b), then that individual was not disqualified from unemployment benefits based upon having voluntarily left their employment. Id. at 490 (emphasis added).

---

[4] Subsection (b) states:

 A person who:
  (1) accepts a layoff under an inverse seniority clause of a validly negotiated contract; and
  (2) otherwise meets the eligibility requirements established by this article;
 is entitled to receive benefits in the same amounts, under the same terms, and subject to the same conditions as any other unemployed person.

We see no reason why such an explicit declaration of the employer's intent is necessary under this statutory provision, either. Courts ascertain intent from less than explicit expressions in a number of circumstances, see, e.g., Auto-Owners Ins. Co. v. Harvey, 842 N.E.2d 1279, 1290–91 (Ind. 2006) (insured's intent to injure inferred in insurance coverage dispute at summary judgment); see also Bethel v. State, 730 N.E.2d 1242, 1246 (Ind. 2000) (intent to commit murder inferred from use of a deadly weapon), and the public policy underlying the Unemployment Compensation Act supports a broad application here as well.

Our General Assembly declared "[e]conomic insecurity due to unemployment . . . to be a serious menace to the health, morale, and welfare of the people of this state and to the maintenance of public order within this state" and that "[p]rotection against this great hazard of our economic life can be provided in some measure by the required and systematic accumulation of funds . . . to provide benefits to the unemployed during periods of unemployment." Ind. Code § 22-4-1-1. Thus, courts regularly construe provisions of the Act liberally to favor the unemployed and promote the Act's humanitarian purpose. See, e.g., Quakenbush v. Review Bd. of Ind. Dept. of Workforce Dev., 891 N.E.2d 1051, 1054 (Ind. Ct. App. 2008); Bailey v. Review Bd. of Ind. Dept. of Workforce Dev., 668 N.E.2d 1293, 1295 (Ind. Ct. App. 1996); Holmes v. Review Bd. of Ind. Emp't Sec. Div., 451 N.E.2d 83, 86 (Ind. Ct. App. 1983).

Chrysler's approach would undermine these humanitarian purposes, allowing a disingenuous employer to side-step its responsibilities under the Act by simply choosing its words carefully to avoid an explicit declaration of intent. This would only invite further harm to those the Act specifically seeks to protect: "those unemployed through no fault of their own." Ind. Code § 22-4-1-1.

For similar reasons, we see no reason that Chrysler must have intended to close the plants where the Employees worked or lay off additional personnel at those plants for Section 22-4-14-1(c) to apply. The statute contains no geographical limitations, and it seems inconsistent to impart one in light of the overall purposes of the Act and the language the General Assembly chose for the exception.

Furthermore, this view discounts the economic reality that Chrysler was a multinational corporation with employees and plants around the world. To single out an individual plant or group of employees ignores that Chrysler's business decisions are based on a more global picture and actions taken at one location necessarily will impact employees at another.

In sum, Indiana Code § 22-4-14-1(c) requires that the employer intend the relevant offer of payment to avert or lessen the effect of a lay-off or plant closure. However, finding such intent does not require the employer to make an explicit declaration in advance; it may be inferred from the nature and character of the employer's collective conduct, statements, and circumstances. It may not, however, be inferred solely from the speculative and subjective beliefs of the employees. Finally, the provision does not require that the offer be made to avert a lay-off or plant closure at the particular plant where the employees work; it may in some cases include other plants or employees throughout the employer's organization.

As we noted above, the Board did not provide an express interpretation of the statute in its conclusions. Still, "consistent with the premise that we grant great weight to the interpretation of a statute by an administrative agency charged with the duty of enforcing the statute . . . we will presume that the agency is familiar with the statutes under which it operates." Trelleborg, 798 N.E.2d at 487 (citing LTV Steel Co., 730 N.E.2d at 1257). More to the point, we do not assume that the Board interpreted the section incorrectly. The question thus remains whether the Board properly applied this law to its unchallenged findings of fact in concluding that Chrysler offered the EVTEP to avert or lessen the effects of a lay-off or plant closure.

B. The Board's Application of Section 22-4-14-1(c). Reviewing the Board's application of subsection (c) amounts to a review of its conclusions as to an ultimate fact. As such, we must determine whether the Board's conclusion was reasonable in light of the evidence before it. McClain, 693 N.E.2d at 1317–18. We will defer to the Board so long as the underlying facts are supported by substantial evidence, the logical inference is not faulty, and "no proposition of law is contravened or ignored" by its conclusions. Id. at 1318.

11

Here, the Board appears to have concluded that the EVTEP ultimately did avert or lessen the effects of a lay-off. It concluded that when employees on lay-off accepted the EVTEP they lessened the effects of that lay-off. (Appellant's App. at 7.) Similarly, those employees who were actively employed averted the effects of a lay-off. (Appellant's App. at 7.) And, while the employees received compensation "to help them transition to other employment in a period of recession and uncertainty," Chrysler benefited "by reducing its workforce when the recall rights were eliminated." (Appellant's App. at 7.) Furthermore, Chrysler's sub-pay obligations for the laid-off employees ceased upon their acceptance, and it was only required to continue its health coverage of any accepting employee for another six months. (Appellant's App. at 7.)

While we find nothing unreasonable or illogical about these conclusions, the particular question presented by Section 22-4-14-1(c) is whether Chrysler intended for the EVTEP to avert or lessen the effect of a lay-off or plant closure—not necessarily whether the EVTEP did so. The Board's decision indicates that it found this to be the case. There is substantial evidence in the record to support this conclusion.

The Board's unchallenged findings were that Chrysler was in the midst of an economic downturn, with plants in other states closing and some employees at those plants being given the option to relocate to Kokomo. (Appellant's App. at 4.) Some employees in Kokomo had already been laid off. (Appellant's App. at 4.) From these basic facts alone, it would be reasonable for the Board to conclude that Chrysler intended that the EVTEP help avert or lessen the effect of a lay-off by reducing its headcount in Kokomo in order to relocate additional out-of-state employees to that plant.

The record also reflects that Chrysler announced the second EVTEP to its employees with a flyer noting that the program was being offered "DUE TO UNPRECEDENTED CONDITIONS IN OUR ECONOMY AND INDUSTRY." (Appellant's App. at 74) (capitalization in original). Chrysler's 2009 EVTEP presentation to its employees summarized the declining industry and noted that "Cost management and cash preservation remain key to Chrysler survival." (Appellant's App. at 95) (emphasis in original). It goes on to reference "the

financial meltdown and freeze in credit," which "led to a devastating automotive industry depression." (Appellant's App. at 97.)

Because of this, the presentation explains that Chrysler sought $7 billion in loans from the federal government. (Appellant's App. at 97.) Some $4 billion of these loans were granted, but with stipulations that Chrysler take action by February 2009 to submit a "Viability Plan" and by March 2009 to submit a "Restructuring Plan Report" showing evidence of progress in its "Viability Plan." (Appellant's App. at 97–98.) The presentation explains the nature of Chrysler's merger with Fiat, including that "Chrysler must be a viable entity by itself," (Appellant's App. at 100) (emphasis in original), and then moves into an explanation of the resulting "Special Programs" it was offering to its employees—including EVTEP. (Appellant's App. at 102–34.)

Chrysler presented the same image to the U.S. government in seeking its $7 billion "bridge loan." (Appellee's App. at 51–64.) It made its "extraordinary request" in response to "a perfect storm comprised of . . . the collapse in demand for light duty vehicles . . . the unprecedented financial crisis . . . and . . . the general global economic downturn." (Appellee's App. at 53.) It emphasizes that it had anticipated this downward trend and had taken "substantial, swift, and wide-ranging" cost cutting measures—including separating over 32,000 employees by the end of 2008. (Appellee's App. at 53.)

In addition to these "substantial strides" toward viability, Chrysler told Congress it would "pursue significant additional restructuring actions and seek meaningful concessions from each of its major constituents."[5] (Appellee's App. at 55.) It anticipated undertaking "significant cost reduction actions," including in its personnel. (Appellee's App. at 55.) It sought the loan—and

---

[5] In a letter to the Secretary of Treasury, Chrysler's Chairman and CEO echoed this comment, specifying that "it was absolutely critical that each of our constituents make significant sacrifice to accomplish our restructuring plan, including . . . of course our own employees." (Appellee's App. at 65.)

was prepared to pursue restructuring—because the alternative of filing for bankruptcy would mean all of its twenty-nine manufacturing plants and twenty-two parts depots "would be permanently shut down immediately" and "53,000 out of the Company's 55,000 hourly and salaried employees would be terminated immediately." (Appellee's App. at 62.)

Justice Frankfurter observed that "there comes a point where this Court should not be ignorant as judges of what we know as men." Watts v. State of Indiana, 338 U.S. 49, 52 (1949). Judge Kirsch said as much in his dissent here, pointing out that "[i]n this economic reality, Chrysler did not have to say that EVTEP was offered to lessen or avert a layoff or plant closing. Such fact was obvious to all." C.G., LLC, 946 N.E.2d at 604 (Kirsch, J., dissenting).

By Chrysler's own words—to Congress and its own employees—EVTEP was part of a company-wide effort intended to avert twenty-nine manufacturing plant closures, twenty-two parts depot closures, and 53,000 lay-offs. We cannot say that the Board's conclusion on this issue of ultimate fact was anything short of reasonable.

**Conclusion**

We affirm the decision of the Review Board.

Dickson, Sullivan, Rucker, and David, JJ., concur.

14