

IN THE

# Court of Appeals of Indiana



FILED
Sep 11 2024, 9:04 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Brookston Resources, Inc., an Illinois Corporation,

*Appellant-Petitioner*

v.

State of Indiana Department of Natural Resources,

*Appellee-Respondent*

---

September 11, 2024

Court of Appeals Case No.
23A-MI-2971

Appeal from the Spencer Circuit Court

The Honorable Karen A. Werner, Judge Pro Tempore

Trial Court Cause No.
74C01-2211-MI-468

---

**Opinion by Judge Tavitas**
Judges Crone and Bradford concur.

**Tavitas, Judge.**

## Case Summary

Brookston Resources, Inc. ("Brookston") appeals the trial court's denial of its petition for judicial review regarding a decision by the Indiana Department of Natural Resources ("Department"). The Indiana Oil and Gas Association ("Association") submitted an *amicus curiae* brief in support of Brookston.

This appeal concerns Brookston's challenge to notices of violation issued by the Department regarding three of Brookston's oil wells. The administrative law judge ("ALJ") upheld the notices of violation, and on judicial review, the trial court denied Brookston's petition. On appeal, Brookston argues that the Department's decision was in excess of statutory authority, arbitrary and capricious, and unsupported by substantial evidence. Specifically, Brookston argues that, because the Department determined in 1992 that abandoned wells in the area of Brookston's wells were adequately plugged, the Department did not have the authority to issue notices of violation in 2019 finding that the abandoned wells were inadequately plugged.

We conclude that the relevant statutes and regulations allow the Department to conduct file reviews of the wells at issue every five years, and those file reviews include a consideration of the abandoned wells. Moreover, as Brookston never obtained injection authorization regarding its wells, any change in the injection rate as a result of the file review would not amount to a modification of the permit. The Department's issuance of the notices of violation was, thus, not

arbitrary and capricious or without statutory authority. Finally, the Department's determination that the abandoned wells have the potential to cause or contribute to the migration of injection fluids into underground sources of drinking water due to inadequate construction or plugging is supported by substantial evidence. Accordingly, we disagree with Brookston's arguments and affirm.

## Issues

Brookston raises several issues, which we revise and restate as:

> I. Whether Brookston waived arguments made on appeal but not made below.
>
> II. Whether the Department's issuance of the notices of violation was arbitrary and capricious or in excess of statutory authority.
>
> III. Whether the Department's notices of violation are supported by substantial evidence.

## Facts

### A. Background

According to the Association, there are 9,750 active oil and gas wells in Indiana. In its *amicus curiae* brief, the Association explains the process of recovering oil as follows:

> **[P]rimary recovery** is the initial phase of an oil and gas well where the natural pressure of the reservoir brings oil to the

surface. Once this pressure drops and oil production decreases, secondary recovery becomes necessary. Only 10% of a reservoir's oil is produced during primary recovery. **Secondary recovery** uses techniques like waterflooding to maintain or increase reservoir pressure and stimulate oil production.

In the Illinois Basin, the water used for injection is usually water brought to the surface along with oil. The saltwater is then injected into the reservoir through injection wells. These wells must be strategically located to ensure even distribution of water pressure across the reservoir. The injection of saltwater helps maintain or increase the reservoir pressure, which has declined during the primary recovery phase. This increased pressure helps push more oil towards the production wells. The injected water acts as a sweeping mechanism, pushing the oil towards the production wells. The water essentially displaces the oil, improving the recovery rate by moving the oil that was not recoverable during the primary phase. Saltwater injection can significantly increase the total recoverable oil from a reservoir beyond what's possible with just primary recovery methods.

*Amicus Curiae* Br. pp. 11-12.

[6] Certain Class II wells located in Spencer County, which are used for secondary recovery efforts, are at issue here. A "Class II well" is defined as:

[A] well that injects fluids:

(1) that are brought to the surface in connection with conventional oil or gas production and can be commingled with wastewaters (other than wastewaters classified as hazardous waste at the time of injection) from gas plants that are an integral part of production operations;

(2) for the enhanced recovery of oil or gas; or

(3) for the storage of hydrocarbons that are liquid at standard temperature and pressure.

Ind. Code § 14-8-2-41.

On August 19, 1991, the Department obtained approval from the United States Environmental Protection Agency ("EPA") to administer the Class II Well Underground Injection Control ("UIC") Program. *See* 40 C.F.R. § 147.750, 56 Fed. Reg. 41072 (Aug. 19, 1991). The program consisted of several "elements," which were "submitted to the EPA in the State's program application." *Id.* One of those elements is the "Program Description." *Id.* The Program Description provided, in part:

> D. Plugging and Abandonment. Permanent abandonment of wells is conducted in accordance with the provisions of 310 IAC 7-1-33 and includes either:
>
> > * Placement of [American Petroleum Institute ("API")] approved slurry cement plugs at the following intervals:
> >
> > > a. From either total depth or fifty (50) feet below, to one hundred (100) feet above all injection zones and,
> > >
> > > b. From fifty (50) feet below the lowest identified [Underground Source of Drinking Water ("USDW")] to the surface.

OR

* Placement of an appropriate mechanical plug at the top of the uppermost injection zone in conjunction with the placement of API approved slurry cement plugs at the following intervals:

a. From the top of the mechanical plug to a point fifty (50) feet above the mechanical plug; and,

b. From fifty (50) feet below the lowest identified USDW to the surface.

Appellant's App. Vol. III pp. 57-58. Inadequate plugging of wells can result in contamination of a USDW.

## B. Subject Wells

[8] These proceedings concern three wells that were converted to Class II wells and have been operated by various companies in Spencer County since the mid-1960s—Curtis Mills No. 4 Well; A. & L. Leistner No. 3 Well; and Leistner No. W-1 Well ("the Subject Wells"). In 1992, shortly after the Department obtained primary enforcement approval regarding Class II wells, the Department conducted a file review of the Subject Wells and determined, in part, that "all wells within 1/4 mile of the subject well[s] have been adequately constructed and require no remedial action." Appellant's App. Vol. II pp. 27, 49, 69.

[9] In 2002, permits to operate the Subject Wells by Bronco Oil Company were revoked. In October 2002, Brookston requested a "change of operator" for the Subject Wells, and the Department issued change of operator permits to Brookston regarding the Subject Wells. *Id.* at 128-30. Each permit provided: "Operator must obtain injection authorization prior to operating this well" and "This permit expires one year from the date of issuance unless the activity authorized by the permit has commenced." *Id.* According to Brookston, Brookston then "expended over Three Hundred Fifty Thousand Dollars ($350,000.00) in installing electrical service, plugging wells within the area, installing new flowlines, installing new injections lines and installing new infrastructure to develop the reservoir underlying the Subject Well[s]." *Id.* at 17, 39, 60-61. Brookston, however, did not request "injection authorization" for the Subject Wells prior to their expenditures and has never operated the Subject Wells.[1] Appellant's App. Vol. III p. 96.

[10] In July 2004, the Department conducted another file review. Contrary to the earlier 1992 file review, the Department determined that the Subject Wells were within one-quarter mile of abandoned wells that contained "[i]nadequate plug[s]," meaning plugs of less than fifty feet of cement ("Questionable Wells"). Appellant's App. Vol. II pp. 131, 132. The Department's determination that some abandoned wells in the vicinity of the Subject Wells were questionable

---

[1] The Department has not asserted that the permits expired, and we assume that the permits for the Subject Wells have not expired.

"was not based upon any new information or information previously unknown on October 7, 2002." Appellant's App. Vol. III p. 77.

[11] The Department directed Brookston to do the following regarding each Subject Well:

> Within 30 days of the date of this notice, please complete and submit the enclosed Corrective Action Plan. The plan must be considered and accepted by the division and implemented by the operator. The corrective action performed must then be reviewed and approved by the Technical Section of the Division of Oil and Gas in order to retain the authorization needed to continue injection.
>
> If you choose the option under Part III for rate restriction, please see the enclosed "Data Requirements for a Rate Restriction." You must supply the Division with data to calculate the allowable injection rate. I will use conservative porosity and permeability data if no actual analytical data is available. However, bottom hole pressure data must be provided by the operator. The injection rate to be assigned to this well is dependent on your choice of corrective action.

Appellant's App. Vol. II p. 131, 132. Brookston, however, did not submit a Corrective Action Plan regarding the Subject Wells.

[12] The Department conducted additional file reviews in March 2019, and again identified several Questionable Wells due to plugs with less than fifty feet of cement. The Department again requested that Brookston complete a Corrective

Action Plan within thirty days.[2]  The letters also proposed a rate restriction option instead of remediating the deficiencies of the Questionable Wells. Brookston again failed to submit a Corrective Action Plan.

[13]  In November 2019, the Department's Division of Oil and Gas sent Brookston notices of violation regarding the Subject Wells; each notice provided that the "location . . . was inspected on 11/12/2019 and was found to be in noncompliance with 312 IAC 29-1 et seq. or IC 14-37 et seq.  The corrective action . . . must be taken by 1/12/2020."  *Id.* at 25, 47, 67.  The Department found that the Questionable Wells "contain deficiencies" in their construction due to "[i]nadequate plug[s]."  *Id.* at 26, 48, 68.  The notices also provided:

> In lieu of remediating the deficiencies for the above well, you may wish to consider a rate assignment (Part III of the Corrective Action Plan).  Within 30 days of the date of this notice, please complete and submit the enclosed Corrective Action Plan.  If you choose the rate restriction option under section III please provide the data outlined in the enclosed "Data Requirement to Obtain a Rate Assignment" guidance document.  The plan must be considered and accepted by the Division and implemented by the operator.

*Id.*

---

[2] According to Brookston, the Questionable Wells "were plugged between June of 1958 and April of 1960." Appellant's App. Vol. III p. 7.

### C. Administrative Proceedings

In December 2019, Brookston sought administrative review of the notices of violation. Brookston argued that:

> This review of "adequate" plugging conducted by the State of Indiana appears to be subjective under its regulations. All the reviews conducted prior to 2004 determined that all wells within the 1/4 mile area of the Subject Well were adequately plugged. Operations were conducted, large amounts of money were expended and the Subject Well was operated pursuant to those reviews. Despite these prior examinations another reviewer concluded in 2004 that wells were inadequately plugged and denied Petitioner its right to operate the Subject Well as it had historically been operated. Following the 2004 review the Department of Natural Resources did not issue a notice of violation. While the Department of Natural Resources provided Petitioner periodic letters concerning the well, an appealable Notice of Violation was not issued until the Notice of Violation which is the subject of the instant matter. . . . [T]he State of Indiana was in error in its determination that the wells within the 1/4 mile area of review were inadequately plugged or that injection will result in the movement of fluids into an underground source of drinking water.

*Id.* at 21-23, 42-44, 63-65.[3]

Brookston also requested an Informal Hearing with the Director of the Division. The parties agreed that "the informal hearing before the Director of

---

[3] Brookston's petition regarding the A & L Leistner No. 3 Subject Well contained similar but slightly different language.

the Division would occur prior to any further proceedings before the ALJ." *Id.* at 93. After the informal hearing, in August 2020, the Director of the Division of Oil and Gas issued his "Findings and Decision on Informal Hearing" and upheld the notices of violation. *Id.* at 90.

[16] Brookston then requested administrative review of the informal hearing decision. In that proceeding, Brookston filed a motion for summary judgment. Brookston sought "a determination from the Administrative Law Judge that [the Department's] conduct in its implementation of the 5-year review program of Class II permits with respect to the Subject Wells is contrary to existing law and that the Division has incorrectly interpreted regulations to allow it to arbitrarily re-review the plugging of wells within a quarter mile of the well site subsequent to the permit issuance or prior review." Appellant's App. Vol. III p. 9. Brookston argued: (1) regulations do not allow the Department to review the "construction and plugging of wells within a quarter-mile radius of the Class II well facility every time it conducts a 5 year file review"; (2) the five-year file review process is conducted to confirm that any new wells drilled within a quarter-mile of the well after the issuance of the permit are also plugged properly, not to reassess plugged wells that existed at the time of the permit issuance; and (3) the circumstances do not meet the requirements to modify a permit. *Id.* at 10. Brookston further argued: "To allow the [Department] to constantly re-review existing wells and issue contrary rulings based on the identical facts and circumstances of its prior rulings creates a system wherein operators cannot rely on the continuing validity of existing permits." *Id.* at 20.

According to Brookston, the authority to review existing wells "is limited to reviews to new or previously unknown matters or new information showing a detriment to the environment." *Id.*

[17] The Department filed a response and designated the affidavit of Gregory Schrader, geologist for the Department, and attached exhibits. Brookston then filed a reply and stated: "Brookston's motion merely seeks a determination as to whether the [Department] may properly continually re-review facility siting for Class II wells every 5 years in connection with its file review program. . . . If the [Department] has this authority then the Motion fails. If the Division does not have this authority, the Motion prevails and [the] Division did not have the right to restrict Brookston's operations." *Id.* at 121-22.

[18] The ALJ issued an interlocutory order denying Brookston's motion for summary judgment. The ALJ found:

> 63. Brookston's concern that the Department has issued determinations and executed various official documents in 1958, 1960, and again in 1992, confirming that the Questionable Wells had been properly plugged, only to reach seemingly irreconcilable conclusions in 2004, and again in 2019, based upon the same factual records considered under the same UIC Program parameters is understandable.
>
> * * * * *
>
> 65. Despite the volume of factual information presented in the parties' pleadings and briefs, the sole issue presented on summary judgment, which could be fully dispositive of this proceeding, is whether the Department may require modification of a Class II

> Injection well based exclusively upon the re-review of information previously known to the Department, or, alternatively, whether the Department's required file review may result in a requirement for Brookston to submit and gain approval for a Corrective Action Plan only when previously known information has been impacted by "new or previously unknown" information.

Appellant's App. Vol. III p. 145. The ALJ concluded that the file reviews were permissible and that "a good faith controversy remains regarding the bases of the Department's conclusion that a well has the potential to serve as a conduit for the migration of fluid into underground sources of drinking water such that Brookston should be required to submit a corrective action plan." *Id.* at 152 (internal quotations omitted). The ALJ, thus, determined that a genuine issue of material fact existed and denied Brookston's motion for summary judgment.

[19] An evidentiary hearing was then held in April 2022. The parties agreed that the issue at the hearing was limited to the issue addressed in the summary judgment proceedings and that the facts found by the ALJ in the summary judgment order were "established as facts found for the purposes of [the] hearing." Appellant's App. Vol. IV p. 7. Schrader testified on behalf of the Department, and James Brooker, president and CEO of Brookston, testified on behalf of Brookston.

[20] The ALJ issued its findings of fact and conclusions of law with the final order on October 6, 2022. The ALJ found:

62. As established in the Interlocutory Order, the sole issue is whether "a well has the potential to serve as a conduit for the migration of fluid into underground sources of drinking water such that Brookston should be required to submit a corrective action plan."

63. The burden of proof on this issue is with the Department by a preponderance of the evidence.

* * * * *

71. When the Department issued the subject permits to Brookston in 2002, the permits were made contingent upon Brookston obtaining injection authorization prior to operating the well. Brookston has not sought such authorization and no injection/pressure rates have been established on the Subject Wells. **As no such rates have been established, it cannot be said that the Department's [notices of violation] would result in a modification of those permits**.

72. The Department has met its burden of establishing that the Subject Wells have the potential to serve as a conduit for the migration of fluid into underground sources of drinking water such that Brookston should be required to submit corrective action plans.

**Final Order**:

73. The Department met its burden of establishing that the Subject Wells have the potential to serve as conduits for the migration of fluid into underground sources of drinking water. Brookston is therefore required to submit corrective action plans to the Department for each Subject Well.

*Id.* at 154, 156-157 (internal citations omitted) (emphasis added).

### D. Judicial Review

[21] Brookston then filed a petition for judicial review. Brookston's petition provided: "The integral issue in this case is whether the Department may properly re-review well/facility siting every 5 years in connection with its file review program of Class II wells/facilities." *Id.* at 163. Brookston argued that "The Department giving conflicting conclusions, based on identical facts and standards, without any real explanation is the very definition of an arbitrary and capricious use of the Department's authority." *Id.* at 171.

[22] The trial court denied Brookston's petition for judicial review and entered findings of fact and conclusions thereon. The trial court found that "the Final Order at issue was not arbitrary and capricious; an abuse of discretion; contrary to law; without observance of procedures required by law; or unsupported by the substantial evidence produced in the agency proceedings." Appellant's App. Vol. II p. 15. Brookston now appeals.

## Discussion and Decision

### I. Standard of Review

[23] Brookston appeals the trial court's denial of its petition for judicial review of the Department's administrative decisions. Before addressing Brookston's specific arguments, we must address recent events that concern the proper standard of review in this matter.

[24] The first event of issue is precipitated by a recent United States Supreme Court opinion. In its *amicus curiae* brief, the Association pointed out that the United States Supreme Court was considering the continued viability of *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984). *Chevron* held that, when reviewing an agency's interpretation of a statute, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43, 104 S. Ct. at 2781. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S. Ct. at 2782. Following briefing in this matter, the United States Supreme Court handed down *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), and overruled *Chevron*. The Court held that "agencies have no special competence in resolving statutory ambiguities." *Loper Bright*, 144 S. Ct. at 2266. Rather,

> Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the [Administrative Procedures Act ("APA"] requires. . . . But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

*Id.* at 2273.

[25] The United States Supreme Court's opinion applies to administrative proceedings under the federal APA, not the Indiana Administrative Orders and Procedures Act ("AOPA"), which is applicable here. Our Supreme Court,

however, has cited *Chevron* with approval while interpreting the AOPA. *See, e.g.*, *Story Bed & Breakfast, LLP v. Brown Cnty. Area Plan Comm'n*, 819 N.E.2d 55, 64 (Ind. 2004) (citing *Chevron*, in part, for the proposition that "[t]he administrative construction of the agency's own documents and statute is entitled to weight"); *cf. Ind. Dep't of Nat. Res. v. Prosser*, 139 N.E.3d 702, 703 (Ind. 2020) (Slaughter, J., dissenting from the denial of transfer) (expressing "deep concerns" with the current system in which "a government agency both finds the facts and interprets the statutes that supply the rules of decision, and the courts' only role (as we have interpreted AOPA) is to defer to all aspects of the agency's decision-making"). We are "bound by our supreme court's decisions, and its precedent is binding on us until it is changed by our supreme court or legislative enactment." *Fox v. Franciscan All., Inc.*, 204 N.E.3d 320, 327 (Ind. Ct. App. 2023), *trans. denied*. Accordingly, despite the United States Supreme Court's opinion in *Loper Bright*, we must apply our Supreme Court's decisions interpreting the AOPA until changed by our Supreme Court or legislative enactment.

[26] The second event at issue here is our General Assembly's amendment of the AOPA, effective July 1, 2024. The amendments have a similar impact as the United States Supreme Court's opinion in *Loper Bright*. Prior to the amendments, the AOPA provided:

> Judicial review of disputed issues of fact must be confined to the agency record for the agency action supplemented by additional evidence taken under section 12 of this chapter. The court may

not try the cause de novo or substitute its judgment for that of the agency.

Ind. Code § 4-21.5-5-11. Under this statute, our Supreme Court held: "An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself." *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind. 2000).

[27]　The amended statute provides:

> (a) Judicial review of disputed issues of fact must be confined to the agency record for the agency action supplemented by additional evidence taken under section 12 of this chapter. A court is not bound by a finding of fact made by the ultimate authority if the finding of fact is not supported by the record.

> (b) The court shall decide all questions of law, including any interpretation of a federal or state constitutional provision, state statute, or agency rule, without deference to any previous interpretation made by the agency.

Ind. Code § 4-21.5-5-11 (effective July 1, 2024). The amendments, however, specifically do "not apply to an administrative proceeding or a proceeding for judicial review pending on June 30, 2024." The amendments apply to: "(1) an administrative proceeding or a proceeding for judicial review commenced after June 30, 2024; or (2) an administrative proceeding conducted after June 30, 2024, on remand from a court." Accordingly, here, we must apply the prior

version of the AOPA, and our Supreme Court's standard of review under the prior version.

[28] Under the AOPA in effect during these proceedings, we may set aside an agency's action if the "person seeking judicial relief has been prejudiced by an agency action that is":

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) contrary to constitutional right, power, privilege, or immunity;
>
> (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (4) without observance of procedure required by law; or
>
> (5) unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d).[4] Brookston bears the burden of showing that the Department's action is invalid. I.C. § 4-21.5-5-14(a).

---

[4] Effective July 1, 2024, Indiana Code Section 4-21.5-5-14(d)(5) requires the person seeking judicial relief to demonstrate that the agency action is "unsupported by a preponderance of the evidence" rather than "unsupported by substantial evidence." Here, we apply the prior statute, which was in effect at the time of the judicial review.

[29] After the administrative agency's denial of Brookston's petitions for administrative review, Brookston filed a petition for judicial review, which the trial court denied. When we review an administrative agency's decision, we stand in the trial court's shoes. *Ind. State Ethics Comm'n v. Sanchez*, 18 N.E.3d 988, 991 (Ind. 2014). "'[O]ur review of agency action is intentionally limited, as we recognize an agency has expertise in its field and the public relies on its authority to govern in that area.'" *Moriarity v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 619 (Ind. 2019) (quoting *Ind. Alcohol and Tobacco Comm'n v. Spirited Sales, LLC*, 79 N.E.3d 371, 375 (Ind. 2017)). We do "not try the facts de novo" but rather "defer to the agency's findings if they are supported by substantial evidence." *Id.* "On the other hand, an agency's conclusions of law are ordinarily reviewed de novo." *Id.*

[30] We are not bound by the agency's conclusions of law, but "'[a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself.'" *Id.* (quoting *Chrysler Grp., LLC v. Review Bd. of Ind. Dept of Workforce Dev.*, 960 N.E.2d 118, 123 (Ind. 2012)). "In fact, 'if the agency's interpretation is reasonable, we stop our analysis and need not move forward with any other proposed interpretation.'" *Id.* (quoting *Jay Classroom Teachers Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016) (citation omitted)).

[31] We utilize our well-known standards for interpreting a statute:

We [] review questions of law, such as the interpretation of a statute, de novo. *Pierce v. State*, 29 N.E.3d 1258, 1265 (Ind. 2015). When construing a statute, our primary goal is to determine and effectuate the legislature's intent. *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1283 (Ind. 2009). To discern that intent, we first look to the statutory language and give effect to its plain and ordinary meaning. *Jackson v. State*, 50 N.E.3d 767, 772 (Ind. 2016). Where the language is clear and unambiguous, "there is 'no room for judicial construction.'" *Id.* (quoting *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 704 (Ind. 2002)). We presume the legislature intended the statutory language to be applied "logically and consistently with the statute's underlying policy and goals, and we avoid construing a statute so as to create an absurd result." *Walczak v. Lab. Works-Ft. Wayne LLC,* 983 N.E.2d 1146, 1154 (Ind. 2013).

*Culver Cmty. Tchrs. Ass'n v. Ind. Educ. Emp. Rels. Bd.*, 174 N.E.3d 601, 604–05 (Ind. 2021).

## II. Brookston Waived Arguments Not Made Below.

On appeal, Brookston argues, in part, that the requirement of fifty feet of cement plugging for the Questionable Wells is a "retroactive" and "newly invented" standard that was not "reviewed by the Indiana Attorney General, [was] not subject [to] public comment, or any other safeguards associated with administrative rule-making in Indiana." Appellant's Br. p. 25. The Department contends that Brookston waived this argument for appellate review because Brookston did not raise the issue below. We agree.

[33] "Issues that are not raised before the administrative agency are generally waived for judicial review." *Ind. Horse Racing Comm'n v. Martin*, 990 N.E.2d 498, 506 n.3 (Ind. Ct. App. 2013). In a footnote in its motion for summary judgment, Brookston briefly argued: "Brookston also disputes that the Division had the authority to implement a policy requiring 50' of continuous cement plugs between the injection reservoir and the underground source of drilling in the absence of a regulation, Indiana Attorney General Review and the accompanying opportunity for public comment of such a policy." Appellant's App. Vol. III p. 6 n.3.

[34] Following the ALJ's denial of Brookston's motion for summary judgment, a hearing was held before the ALJ, and the parties agreed that the issue was limited to the issue presented in the summary judgment proceedings: "whether the Department may require modification of a Class II Injection well based exclusively upon the re-review of information previously known to the Department, or, alternatively, whether the Department's required file review may result in a requirement for Brookston to submit and gain approval for a Corrective Action Plan only when previously known information has been impacted by 'new or previously unknown' information." Appellant's App. Vol. III p. 145. Following the ALJ's denial of Brookston's petitions, Brookston filed a petition for judicial review and presented the issue as: "whether the Department may properly re-review well/facility siting every 5 years in connection with its file review program of Class II wells/facilities." Appellant's App. Vol. IV p. 163. The Department's authority to require fifty feet of cement

plugs was not raised during the hearing before the ALJ or during the judicial review proceedings. Accordingly, we conclude that Brookston has waived this argument.[5]

## III. The Department's Interpretation of the Relevant Statutes and Regulations is Not Arbitrary or Capricious and Does Not Exceed Its Statutory Authority.

[35] Next, Brookston argues that the Department's 2019 file review was not permitted by the relevant statutes and regulations and was arbitrary or capricious because the 2019 file review differed from the 1992 file review. Specifically, Brookston argues that "there is no authority for modifying a permit based on a re-review of the construction and/or plugging of those wells within the area of review." Appellant's Br. p. 21. We, however, conclude that the relevant regulations in effect at the time of the 2019 file review required file reviews of Class II wells every five years, and thus, the 2019 file review was permissible under the regulations. Further, the 2019 file review could consider whether wells with inadequate plugging existed within the area of review—in other words, whether the abandoned wells were adequately plugged. Although

---

[5] The Department also argues that Brookston waived any argument that the Department cannot implement a stricter regulatory scheme than the federal Safe Water Drinking Act. The Department claims that Brookston merely argued that the Department could not promulgate rules that conflicted with the federal regulations. As these arguments are related, we do not consider Brookston's argument to be waived.

*Amicus curiae*, the Association, argues that the Department should be equitably estopped from asserting that the Questionable Wells were inadequately plugged. "An amicus is not permitted to raise new questions but rather must accept the case as it finds it at the time of its petition to intervene." *Ind. Dep't of Transp. v. FMG Indianapolis, LLC*, 167 N.E.3d 321, 333 (Ind. Ct. App. 2021), *aff'd on reh'g*, 171 N.E.3d 1070 (Ind. Ct. App. 2021), *trans. denied*. As equitable estoppel was not raised below, we will not address this argument.

Brookston argues that the Department cannot, during the five-year file reviews, consider information that was available at the time of the initial permit, we do not find the regulations relied upon by Brookston to be applicable.

[36]     As discussed above, the Department obtained primary enforcement authority regarding Class II wells from the EPA in 1991. *See* Ind. Code § 14-37-3-12; 40 C.F.R. § 147.750. The Department enforces "the requirements of the Underground Injection Control Program and all other rules under this article to **prevent the pollution or endangerment of underground sources of drinking water** caused by a well regulated by this article." I.C. § 14-37-3-12(b) (emphasis added). The federal regulations, however, "establish **minimum** requirements for UIC programs." 40 C.F.R. § 144.1(b)(1) (emphasis added).

[37]     A permit authorizing the operation of a Class II Well "is effective for the life of the well so long as the well is operated according to IC 14-37, [312 IAC 29], and the terms of the permit unless the permit is revoked, expired, or otherwise terminated under this article." 312 Ind. Admin. Code 29-4-9. Additionally, as part of the Department's regulation of Class II wells, the Department promulgated the following regulation regarding file reviews:

> (a) **At any time, but at least every five (5) years, the division will perform a file review of a Class II well to determine whether continued operation of the well meets the requirements of IC 14-37 and this article**.
>
> (b) A review conducted under subsection (a) may consider the following:

(1) The current injection intervals.

(2) Maximum injection pressures and rates.

(3) Compliance with well construction requirements for Class II wells including internal and external mechanical integrity of the Class II well.

(4) **A survey of all wells within the area of review that penetrate the injection zone to consider whether these wells may:**

> **(A) be adversely affected by the operation of the Class II well; and**

> **(B) have the potential to cause or contribute to the migration of injection fluids into underground sources of drinking water due to inadequate construction or plugging**.

(c) **If the division determines a well has the potential to serve as a conduit for the migration of fluid into underground sources of drinking water a corrective action plan will be established under this section.**

(d) The division shall notify the owner or operator of the Class II well and request a corrective action plan that will prevent fluid movement:

(1) into an underground source of drinking water;

(2) to the surface; or

(3) into an unpermitted zone.

(e) Within thirty (30) days after receiving notice from the division the owner or operator of the Class II well shall submit a proposed corrective action plan to prevent the movement of fluid into an underground source of drinking water . . . .

(f) The division shall evaluate the proposed corrective action plan to determine whether modifications are necessary.

(g) The division director may require additional testing or special equipment to protect an underground source of drinking water.

(h) The division director shall establish a final corrective action plan to ensure protection of underground sources of drinking water and prevention of fluid movement to the surface or into an unpermitted zone that shall become a condition to the permit to operate the Class II well.

(i) The final corrective action plan established under subsection (h) becomes effective within thirty (30) days of issuance unless a person requests administrative review under IC 4-21.5.

312 Ind. Admin. Code 29-28-8 (effective December 31, 2017) (emphasis added).[6] Similarly, under the federal regulations, Class II well permits are reviewed "at least once every 5 years to determine whether [the permit] should be modified, revoked and reissued, terminated or a minor modification made as

---

[6] Many of the applicable regulations were created or amended in 2017. Although different versions of the regulations would have applied during the 2004 file review, we focus our attention on the regulations applicable during the 2019 file review, which resulted in the notices of violation at issue here.

provided in §§ 144.39, 144.40, or 144.41." 40 C.F.R. § 144.36(a); *see also* Program Description, Appellant's App. Vol. III pp. 44 ("All Class II wells will be reviewed at least once every five (5) years to determine if any modifications to a permit should be made in order to maintain compliance with 310 IAC 7-1.5.").

[38] Indiana's regulation, thus, authorized the Department to conduct file reviews of Class II wells every five years, and each file review includes a survey of other wells in the area of review. Here, the notices of violation resulted from the Department's 2019 file review of the Subject Wells, which included a survey of the abandoned wells in the area of review. The concern was, thus, whether the abandoned wells could "be adversely affected by the operation of" the Subject Wells and "have the potential to cause or contribute to the migration of injection fluids into underground sources of drinking water due to inadequate construction or plugging." 312 Ind. Admin. Code 29-28-8(b)(4). The Department determined that some of the abandoned wells in the area were inadequately plugged.

[39] Despite the Indiana regulation's plain language, Brookston argues that the five-year file review is "strictly limited to new wells being located within the area of review and to matters previously unknown" and that the five-year file review regulation "as implemented by the Department" is not contemplated by the "Safe Drinking Water Act, the UIC, or Indiana's UIC program document." Appellant's Br. pp. 20-21.

In support of this argument, Brookston relies upon provisions regarding the modification of permits. *See* Program Description, Appellant's App. Vol. II p. 43-44; 312 Ind. Admin. Code 29-4-8.[7] The ALJ, however, found that:

> When the Department issued the subject permits to Brookston in 2002, the permits were made contingent upon Brookston obtaining injection authorization prior to operating the well. Brookston has not sought such authorization and no injection/pressure rates have been established on the Subject Wells. As no such rates have been established, it cannot be said that the Department's [notices of violation] would result in a modification of those permits.

Appellant's App. Vol. IV p. 156. We agree with the ALJ.

Each change of operator permit provided: "Operator must obtain injection authorization prior to operating this well" and "This permit expires one year from the date of issuance unless the activity authorized by the permit has commenced." Appellant's App. Vol. II pp. 128-30. Brookston, however, has never requested or obtained injection authorization for the Subject Wells. The Corrective Action Plan requested that Brookston "open the dialog" and resolve concerns regarding the Questionable Wells, which often include pressure or rate restrictions. Appellant's App. Vol. IV p. 46. Even if the Department's Corrective Action Plan requirements would have resulted in a lower injection rate, we fail to see how that would have resulted in a modification of the permit

---

[7] Brookston relies upon 312 Indiana Administrative Code 16-3-4(a). This regulation, however, was repealed effective December 31, 2017, and replaced with 312 Indiana Administrative Code 29-4-8.

because initial injection rates were never established. Brookston's arguments, thus, are misplaced; the Department's interpretation of the relevant statutes and regulations was not arbitrary or capricious or without statutory authority.[8]

## IV. The Department's Notices of Violation Were Supported By Substantial Evidence.

[42] Finally, Brookston argues that the results of the 2019 file reviews are not supported by substantial evidence. Brookston contends that "[t]here is no evidence presented by the Department that the Questionable Wells present a current or future risk of groundwater contamination. . . ." Appellant's Br. p. 27. Brookston argues that the Department was required to present "data or empirical evidence of heightened risk of contamination." *Id.* at 28.

[43] Substantial evidence means "more than a scintilla; that is, reasonable minds might accept it as adequate to support the conclusion." *Ind. High Sch. Athletic*

---

[8] Moreover, to the extent that the modification provisions are applicable here, the federal regulations serve as **minimum requirements** for the UIC programs, *see* 40 C.F.R. § 144.1(b)(1), and provide that permits may be modified if the "Director has received information. Permits *other than for Class II* and III wells may be modified during their terms for this cause only if the information was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and would have justified the application of different permit conditions at the time of issuance." 40 C.F.R. § 144.39. The ALJ noted that, under subsection (a)(2), permits for wells, **other than** Class II wells, may be modified only if the information was **not available** at the time of the permit issuance. Here, however, Class II wells are at issue. The ALJ, thus, concluded that, under this language, a permit for a Class II well may be modified based on information that **was available** at the time of permit issuance, except for the suitability of the facility location. Appellant's App. Vol. IV p. 156. We agree. The plain language of the federal regulation, which is a minimum requirement for UIC programs, allows the modification of Class II well permits even if the information resulting in the modification was available at the time the permit was originally issued (except for the suitability of the facility location). Accordingly, under the federal regulations, even though the length of the cement plugs of the Questionable Wells was known to the Department at the time of the original issuance of permits to the Subject Wells, the Department could later modify the permit based on that information.

*Ass'n, Inc. v. Watson*, 938 N.E.2d 672, 681 (Ind. 2010). "It need not reach the level of preponderance." *Id.*

[44] Here, according to Schrader, an existing well is considered passing if it has fifty feet of cement above the injection zone but below the underground source of drinking water. Schrader testified that the Questionable Wells have less than fifty feet of cement above the injection zone but below the underground source of drinking water. These Questionable Wells are within one-quarter mile of the Subject Wells. Schrader testified that the geological formation, "Jackson Sandstone," is present at the "injection zone" and "all of the wells within the quarter mile," and Jackson Sandstone is "considered a possible lateral conduit." Appellant's App. Vol. IV p. 21. The purpose of the file review is to see if injected fluids "can come up [a] potentially open conduit." *Id.* Generally, Schrader determines whether "the pressure and rate are still proper to protect the groundwater from [ ] being intruded on by the injected saltwater." *Id.* at 40.

[45] Brookston, however, contests whether an underground source of drinking water ("USDW") is present at this location. On this issue, the ALJ found:

> 42. Whether a USDW could be found at the Jackson sandstone is, however, contested.
>
> 43. According to Schrader, the presence of USDW would not normally be noted on well logs. Rather, the determination is made based on a "geo-physical log of some sort, the electrical log or induction log that can allow us to determine whether the freshwater zone has changed to a salt-water zone. . . ." Those logs were not available to Schrader so he "extrapolated from

other areas." Schrader testified he determined a USDW exists due to the indication on the well logs that sandstone existed which indicated the potential for the presence of a USDW.

44. Schrader admitted the area is devoid of water wells, which could mean there is no USDW or that either there is no reason for a water well to have been drilled or that there are existing wells which have not been reported to the Department's Division of Water.

45. Brooker points to the absence of any indication of a source of drinking water in the drilling records of the Questionable Wells as requiring a conclusion that no USDW exists. According to Brooker, in his experience, a USDW, if one existed, would have been discovered during drilling, and, if discovered, would have been recorded on the drilling records.

* * * * *

48. In Brooker's experience, the presence of USDW would have been indicated on the well logs because the presence of fluid in the bore hole would have impacted drilling. Further, according to Brooker, the conditions encountered during the drilling process would have been noted because the conditions are important to the determination of whether oil exists at the well site. Also, because there is no indication pipes were dropped during drilling to prevent water getting into the bore hole, there was no water present. Brooker opined there was no USDW that would impact at the Jackson sandstone.

49. Brooker also opined there is a low probability of injection fluid migrating to the USDW due to the low permeability of the Jackson sandstone. Brooker's testimony does not, however, negate Schrader's finding that migration could occur.

50. The expertise of both Shrader and Brooker have been demonstrated by their respective testimonies. The credibility of either witness is not doubted.

51. Both Schrader's and Brooker's opinions on the presence, or absence, of a USDW is based upon a paper review and not a physical review of the location.

52. Schrader's determination of the potential presence of an USDW is supported by the evidence.

*Id*. at 152-53 (record citations omitted).

[46] Brookston does not specifically contest any of these findings by the ALJ. Schrader and Brooker analyzed the available data and came to different conclusions regarding the potential for an underground source of drinking water. Brookston's argument is merely a request that we reweigh the evidence and judge the credibility of the witnesses, which we cannot do. Accordingly, the Department's determination that the Questionable Wells "have the potential to cause or contribute to the migration of injection fluids into underground sources of drinking water due to inadequate construction or plugging" is supported by substantial evidence. 312 Ind. Admin. Code 29-28-8.

## Conclusion

[47] The Department's decision regarding the Subject Wells does not exceed its statutory authority; it is not arbitrary or capricious; and it is supported by substantial evidence. Accordingly, we affirm the trial court's denial of Brookston's petition for judicial review.

Affirmed.

Crone, J., and Bradford, J., concur.

ATTORNEY FOR APPELLANT

William C. Illingworth
Illingworth Law Group LLC
Evansville, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana


ATTORNEYS FOR AMICUS CURIAE

Chad J. Sullivan
Chandler A. Lacy
Jackson Kelly PLLC
Evansville, Indiana